Carol BRILL, Plaintiff–Appellant,

v.

LANTE CORPORATION,
Defendant–Appellee.

No. 96–3446.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 20, 1997.

Decided July 8, 1997.

Aaron Benjamin Maduff (argued), Maduff & Maduff, Chicago, IL, for Plaintiff–Appellant.

Steven B. Varick (argued), McBride, Baker & Coles, Chicago, IL, for Defendant–Appellee.

Before POSNER, Chief Judge, and ESCHBACH and MANION, Circuit Judges.

MANION, Circuit Judge.

Carol Brill worked at Lante Corporation, a computer consulting firm, for less than two years. During that period, Lante claims Brill alienated an important client of the company, failed to improve her technical skills, and generally proved to her superiors that she was not cut out to be a computer consultant. After Lante did not promote Brill to the position of senior consultant (promoting instead two men), she brought a sex discrimination claim under Title VII against the company, adding that she was fired and harassed on account of her sex. The district court granted summary judgment in favor of Lante. Brill appeals and we affirm.

## I.

Lante hired Carol Brill in September 1991 as an entry-level consultant. Her first job was to administer a computer network at a trade show; Lante hoped that the experience would lead to more high-tech work for its clients. Lante trained Brill to use Lotus "Notes," a software package, and her early evaluations reveal that she did well enough with that. But after a year at the company, she was behind Lante's expectations. Her first annual performance evaluation criticized her "narrow" skill set, and also noted that she was "unpredictable in client situations." She wasn't supposed to get a raise that year, but after complaining to the company president, her salary was raised 10%.

In January 1993, Lante assigned Brill to her first large-scale client project: installing a computer network, complete with electronic mail, at Sega (the video game manufacturer). During the network installation and beyond, Brill had trouble dealing with the lead client contact at Sega, Bill Downs. Brill claims that Downs screamed and once threw a pen at her. Lante claims that Downs was dissatisfied with the pace of Brill's work and that he threatened to cancel the Lante contract on account of Brill. Jean Giovetti, Brill's supervisor at the time, shared Downs' concerns with Brill. According to a March 1993 e-mail from Giovetti to Lante's consulting development manager, Brill told Giovetti that Downs was an "idiot" and an "asshole" and said he should be shot. Brill denies saying that, and also denies Giovetti's characterization of her dealings with Downs as "dripp[ing] with condescension and disrespect."

While Brill's comments concerning Downs are disputed, there is no dispute that after the Sega project Giovetti evaluated Brill's performance in this way: "At the end of the project, Carol's relationship with the client was hindered by her personal intolerance of Bill Downs. Although she did not call Bill an 'idiot' to his face, her intonation projected her disrespect which compromised Lante's ability to satisfy Sega." Giovetti added: "Carol's first reaction to a challenging viewpoint or constructive criticism is defensiveness and intolerance. This attitude makes it very difficult to work with Carol in a team environment."

Brill's next big assignment was a Sears account to develop "client-server" applications. She apparently had a better relationship with that client, but her technical skills again failed to impress. At the end of the assignment, her supervisor, Mary Ann Curvey, gave her a "Technical Ability" grade of "6," which is in between satisfactory (5) and marginal (7). Curvey allowed that Brill had

to work in "a very unpredictable development environment," and that she had showed some improvement over the course of the assignment. Nevertheless, Curvey recommended "a structured programming background" before Brill was to try her hand at programming again.

In July 1993, Brill was assigned an internal "Timesheets" project, which required her to construct a system to track time devoted to projects. She worked little on that project and instead devoted much of her time to looking for a new job. On August 18, Brill asked her supervisor at the time, Mark Gusmano, to remove her from the project. When Gusmano discovered that she was looking elsewhere, she was fired (actually, it is uncontested that "Gusmano and Brill agreed that her employment would end"). Brill quickly got a new job paying significantly more.

On March 13, 1995, Brill sued Lante, claiming sex discrimination under Title VII. Count I of Brill's complaint related to Lante's failure to promote her to the position of senior consultant (she held the title "consultant" throughout her employment at Lante). Brill claimed that the company promoted two men (Michael Gitre and Thomas O'Hara) to the senior consultant position rather than her because she is a woman. Lante responded that Gitre and O'Hara were better qualified than Brill. Count II claimed that she had been fired on account of her sex. According to Lante, Brill was fired because she could not get along with clients, she failed to improve her technical skills, and she was looking for employment elsewhere.

Count III claimed she was the victim of sexual harassment while at Lante. That claim principally is based on four events. The first occurred in July 1992 while Brill was attending a trade show in San Jose, California with the company president, consultant Mike Gitre, and others. Brill and her coworkers stayed at a hotel where a women's swimming suit photo shoot was being held. Her male coworkers told Gitre that the women were "beautiful" and that he should consider dating one of them; Brill characterized

the scene as resembling a "locker room," but did not describe the comments in any more detail. On another occasion, at dinner late one night, Lante's president described to Gitre the breasts and face of a woman sitting nearby but out of Gitre's sight. The third event occurred in November 1992. Upon learning that Brill was pregnant but unmarried, Ed Kennedy, then Lante's director of consulting, shared his religious belief with her that premarital sex was wrong. The fourth incident occurred in summer, 1993, when a male consulting manager yelled at Brill while "towering" over her after he "misunderstood" (according to Brill) a comment she had made about a client.

General discovery closed in this case on December 15, 1995, but in a hearing before the district court held on that date Brill's lawyer intimated that a motion to compel responses to discovery would be forthcoming. The district court suggested that the parties resolve their discovery disputes "within the next week" and file any motions to compel "shortly thereafter." On January 23, 1996, Lante moved for summary judgment; on the same day, Brill's counsel sought leave to withdraw as plaintiff's counsel. Nearly three weeks later, Brill's original attorney filed a motion to compel compliance with discovery.[1] The court granted the motion to withdraw (by that point Brill had secured new counsel, her same counsel on appeal), denied plaintiff's motion to compel, and set a briefing schedule on Lante's summary judgment motion. After the motion for summary judgment was fully briefed, the court dismissed Brill's case in its entirety.

## II.

There are two primary ways a plaintiff claiming discrimination under Title VII can overcome an employer's motion for summary judgment. The first is by putting in enough evidence (whether direct or circumstantial) to raise a genuine issue concerning the employer's motivation in carrying out the challenged employment action. See, e.g., Troupe v. May Dep't Stores Co., 20 F.3d 734, 736 (7th Cir.

1. Brill's original attorney served Lante with the motion to compel by mail on January 29, but

waited until February 13 (the date of presentment) to file the motion with the district court.

1994). The second is the so-called *McDonnell Douglas* method, the frequently used burden-shifting framework first set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–03, 93 S.Ct. 1817, 1824–25, 36 L.Ed.2d 668 (1973). *See Hunt–Golliday v. Metropolitan Water Reclamation District*, 104 F.3d 1004, 1006–07 (7th Cir.1997) (collecting cases published in the last year that applied the burden-shifting approach).

The district court approached this case under the *McDonnell Douglas* framework, and the parties appear to agree that this is the approach we should use. Absent some direct evidence of discrimination, this methodology allows a plaintiff to prove her case through "indirect" evidence, *McDonnell Douglas*, 411 U.S. at 802–03, 93 S.Ct. at 1824–25, which basically means that she may rely on inferences. She (or he) does this by establishing the well-known prima facie case, which was meant to be flexible and to fit the facts of virtually any type of claim. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252 n. 5, 101 S.Ct. 1089, 1093 n. 5, 67 L.Ed.2d 207 (1981). In a discharge case, the plaintiff must show that (1) she is a member of a protected group (which of course all men and women are in sex discrimination cases); (2) she was meeting the employer's legitimate job expectations; (3) she was discharged; and (4) her employer sought a replacement for her.[2] *See Sample v. Aldi Inc.*, 61 F.3d 544, 548 (7th Cir.1995). In a failure to promote case, the plaintiff must demonstrate that (1) she was a member of a protected group; (2) she applied for and was qualified for the position sought; (3) she was rejected for the position; and (4) those that were promoted had similar or lesser qualifications for the job, or, in other words, they were not more qualified than she. *Id.*

If the plaintiff can do all of this, then the defendant may explain why it failed to promote her (or why it fired her), and if those reasons are nondiscriminatory on their face, the ball returns to the plaintiff's court. She must demonstrate that those reasons (each of them, if a reason standing alone was sufficient to cause her employer to take the action it did, *Russell v. Acme–Evans Co.*, 51 F.3d 64, 69 (7th Cir.1995)), are lies. Moreover, if the company honestly believed in those reasons, the plaintiff loses even if the reasons are foolish or trivial or even baseless. *See McCoy v. WGN Continental Broadcasting Co.*, 957 F.2d 368, 373 (7th Cir.1992) ("[T]he issue of pretext does not address the correctness or desirability of reasons offered for employment decisions. Rather, it addresses the issue of whether the employer honestly believes in the reasons it offers.").

This is the relay confronting district courts each time they face a discrimination lawsuit brought under the *McDonnell Douglas* framework. Because more than 90 percent of employment cases are resolved before trial, *Wallace*, 103 F.3d at 1396, they face it often, and so do we. But it is a necessary schematic if the real cases of discrimination are to emerge from the "spurious ones." *Russell*, 51 F.3d at 71. We therefore apply it to Brill's case to determine if the district court was correct in putting an end to it when it did.

## III.

Brill believes that she should have been promoted to the senior consultant position, and that the reason Mike Gitre and Tom O'Hara were promoted instead of her is because of her sex. In her main brief, she lists her performance evaluation scores on a 1 to 10 scale (from outstanding to unsatisfactory) in 36 different categories covering seven different time periods. In general, the scores reflect a slow but steady decline, averaging 2's and 3's in her first year, but 4's and 5's in her second. Gitre's scores are not compiled, but they are in the record. In general, they appear to be consistently good, averaging

---

**2.** The prima facie case never was meant to be applied in rote fashion, which is why in discharge cases some of our opinions require evidence that the employer sought a replacement for the plaintiff, *see Sample*, 61 F.3d at 548, *Hong v. Children's Memorial Hosp.*, 993 F.2d 1257, 1261 (7th Cir.1993), while others do not. *See*, *e.g.*, *Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1398 (7th Cir.1997) ("[A]n employer who fires an employee because of his membership in one of the protected groups does not purchase immunity from the statute, or, again, from the *McDonnell Douglas* formula, by not replacing the employee.").

between 2 and 3. In "head to head" competition at a "Shownet" trade show in early 1992, Gitre received an overall score of 2 and Brill a 3. The difference appears to be their relative technical proficiencies; Gitre's composite technical ability score was 2 (including a "1" for his ability to learn new skills quickly), while Brill's score for these categories was 3. The last evaluation we have of Gitre prior to his promotion is for the period September to November 1992; his overall score is 2. By that point Brill's evaluations had started to slip; her August to September 1992 evaluation assessed her overall performance as "4 + ."

There is much less in the record concerning O'Hara's promotion to senior consultant, which Brill believes is another instance of sex discrimination. Mark Tebbe, the company's president, characterized O'Hara's analytical background as "strong," and there is no evidence that Tebbe truly believed otherwise. Nor did Brill provide any evidence calling into question Lante's decision to promote O'Hara instead of her. It is unclear why Brill provided the district court with two evaluations grading O'Hara's performance as a senior consultant; O'Hara's performance *after* his promotion to the position is not relevant to Brill's claim of discrimination.

■ Even if Brill were as qualified as Gitre or O'Hara for promotion (which is questionable based on this record), the fact remains that Lante determined she was not. We would reverse the issuance of summary judgment only if Brill had demonstrated that Lante's reasons for not promoting her were pretextual, or, in other words, lies. Lante claims that Brill lacked discretion—pointing to her run-in with client Downs—and possessed limited technical skills compared to Gitre and O'Hara. Brill responds that the complaints concerning her client relations are "inadmissible hearsay testimony from [Lante's] own employees," and that Lante "papered her file" with negative performance evaluations after she complained about the sexual banter she heard at the San Jose trade show.

■ Brill is mistaken to think that her difficulties with clients—in particular Downs—are supported by inadmissible hear-

say. Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Fed.R.Evid. 801(c). The question is not whether Brill actually referred to a client as an "idiot" and suggested that he be shot; what is important is Lante's *honest belief* that she said those things. *See Rand v. CF Industries, Inc.*, 42 F.3d 1139, 1145 (7th Cir.1994). Here, the record contains Jean Giovetti's e-mail to the company's consulting manager dated March 11, 1993. The message details Brill's name-calling and her "condescension and disrespect" toward the client, and while Brill disputes its accuracy, she does not give any reason why the higher-ups at Lante might have disbelieved it. Indeed, the conclusion that Brill lacked discretion is corroborated by a series of performance evaluations. Her 1991–92 annual performance evaluation, completed by Ed Kennedy, the company's general manager, included a "6" for the "professional application" category. Adjacent to the subcategory "tact," for which Brill also received a 6, Kennedy wrote "needs less chit chat and more discretion in speaking to clients."

■ This brings us to Lante's second reason for not promoting Brill: her technical skills relative to Gitre's and O'Hara's. As we have noted, the record has a lot more in it about Gitre than it does about O'Hara, which may be why both parties focus on Gitre's promotion in their briefs. In any case, while Brill was qualified to do the job she had, the record tells us that her technical skills did not advance as quickly as Lante would have liked. That may have been Lante's fault, not Brill's-indeed, one of her last evaluations states that she received "little training or feedback." But while Brill proposes that a jury should determine if her lack of training was itself the result of discrimination, she offers no support for such a conspiracy, and the record suggests that Lante spent little time training its consultants and preferred "quick studies" like Gitre. Such a preference is Lante's to make, and not ours to judge as long as it is nondiscriminatory. Brill's submission of an "expert" affidavit to the district court is perplexing. Brill's so-called computer expert decided for himself that Brill indeed was qualified (at least technically, we

presume) for promotion to senior consultant. But the "expert" never supervised Brill, never spoke with Brill's clients, never assessed her performance from the company's perspective. Courts refuse to sit in judgment as super-personnel departments overseeing corporate decisions, even if some judges think the decisions to be mistaken or perplexing or silly. *Kralman v. Illinois Dep't of Veterans' Affairs*, 23 F.3d 150, 156 (7th Cir.1994). If not judges, then certainly outside "experts" cannot override a personnel decision.

Brill's real argument is that she never had a chance at Lante: she concedes that her evaluations were sub-par in important areas, but contends that they were tainted by the decisionmakers' discriminatory animus. From her perspective, it all started when she went to San Jose to work on a trade show with her male colleagues, including the company's president. When they saw a bikini contest in the hotel where they were staying, they commented the women were "beautiful," and suggested to Gitre (one of the men promoted) that he consider dating them. When they went out to dinner, something possessed the company's president to describe to Gitre the breasts of a woman sitting nearby. And when Brill decided not to participate as (in her words) "one of the boys," the result was "[s]omeone in senior management ... put out the word that [she] was not to succeed."

■ Brill's theory is at least plausible. We can envision a scenario in which a plaintiff demonstrates that her employer trumped up negative evaluations of her work so that it would have a facially legal reason to pass her over for a promotion or even fire her. In such a case, the negative evaluations would hardly constitute a nondiscriminatory reason for the employer's decision. *See, e.g., Shager v. Upjohn Co.*, 913 F.2d 398, 405 (7th Cir. 1990) (employer cannot hide behind plaintiff's poor job performance if employer's prejudice caused it to set plaintiff up to fail). But we have presented Brill's theory far more directly than she does in her single brief (her lawyers filed no reply), and there are problems with its application to this case. The first is that excluding Brill for not being "one of the boys" in this context is not strictly sex-based. Suppose one of the men (say Gitre) had the maturity not to participate in the low-brow banter. In that circumstance he too would not have been considered "one of the boys," thus suffering the same purported fate Brill experienced. The second problem is that Brill is not entitled to try out her theory on a jury unless it fits the facts in the record, and it does not. Two months after the San Jose incident, Brill received no raise from Ed Kennedy. After she complained to him, he approved a 4% raise. Still unsatisfied, Brill complained to Lante's president—the one who commented about the woman's breasts at dinner—and her raise was increased to 10%. Another "one of the boys" in San Jose, John Meyer, gave Brill similar evaluations before and after the trade show. Brill's overall grade is 3 in both evaluations, though Meyer's evaluation after San Jose instructs Brill to "remain cognizant of [the] impression she can leave with the client." Still another problem is that two of Brill's final three evaluations were completed by female supervisors. While it certainly is possible for a female supervisor to discriminate against another female on the basis of her sex, it cuts against the heart of Brill's "one of the boys" argument. At bottom, Brill's theory is that her evaluators, two of whom were women, conspired to negatively assess her technical "skill set" and temperament toward clients, and gave her poorer marks than they gave men such as Gitre and O'Hara to cover up their discriminatory animus. She gives us no reason why they would go to such lengths to ensure she was not promoted (as we say, we had to glean the theory from her appellate brief in the first place), and she provides no circumstantial evidence that would make the theory plausible. *See Anderson v. City of Bessemer City*, 470 U.S. 564, 575, 105 S.Ct. 1504, 1512, 84 L.Ed.2d 518 (1985) ("the story itself may be so internally inconsistent or implausible on its face that a reasonable factfinder would not credit it").

Brill's second claim is that she was fired because of her sex. This is somewhat curious, because in responding to Lante's Statement of Uncontested Facts before the district court, Brill agreed to this: "On August 18, 1993, Brill asked Gusmano to remove her from the [Timesheets] project. At the time Gusmano asked her if she was looking for

another job; she responded that she was, and Gusmano and Brill agreed that her employment would end." This sounds like Brill's departure from the company was mutual rather than unilateral. But Lante does not press this point on appeal, and we interpret the record in a light most favorable to Brill, not Lante. *Kralman*, 23 F.3d at 152. So we assume for present purposes that Lante fired Brill, and because the parties concede that on balance Brill was performing her job satisfactorily (her last evaluation in the record confirms this), the question becomes why.

■ Lante gives three reasons why it fired Brill: (1) her "abrasive personality" and inability to work with clients; (2) her "failure" to master high-tech software; and (3) her own plan to leave Lante. We have already discussed the first two reasons with respect to Lante's decision not to promote Brill. As we noted, Lante claimed that Brill jeopardized the Sega project with her poor relations with Downs, and the record supports this concern, if not *necessarily* its accuracy. The record also supports Lante's concern that Brill improve her technical "skill set." Her last "technical ability" grade in the record is a 6 (lying between satisfactory and marginal); she also received a 6 for her "ability to learn new technical areas quickly." Brill's supervisor at the time (a woman) noted that she was evaluating Brill's first programming assignment, and that Brill needed "more experience with creating programming solutions and a more structured programming background." Nevertheless, while it appears that Brill may not have had enough training to be considered technically proficient, the fact remains that she had more room to improve than Lante desired.

■ But Brill claims her technical skills were fine. Again, she points us to her "expert" affidavit, as if a declaration solicited by Brill could be any more able to contradict an employer's performance assessment than "an employee's [own] self-serving statements about his ability." *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir.1992). What could it prove? At most that Lante's assessment was incorrect, which would be a waste of time because "[t]he question is not whether the [employer's performance] ratings were *right* but whether the employer's description of its reasons is *honest.*" *Id.*

Lante's third reason for firing Brill—she was looking for a new job and planned to leave on her own—also has support in the record. Brill concedes that she was assigned an internal "Timesheets" project in July 1993, and that she worked on the project only 25.5 hours prior to her termination on August 18. She also concedes that she was actively searching for another job during this period, and that she began sending out her resume to prospective employers two weeks before she was fired. Perhaps Brill would not have been fired had she sent a clear message that she wanted to stay. We suspect that Brill's on-the-job search for employment elsewhere was hardly the message Lante expected. In all events, the record reveals that Lante did not fire Brill until it learned she was looking for a new job, a fact which dooms any effort by her to prove pretext.[3]

Lastly, it is unclear whether Lante would have fired Brill had she interacted well with her clients but still struggled technically, or had she soared technically but still had run-ins with her clients, or simply had she wanted to stay at the company. Lante has not told us whether each of its reasons independently or collectively supported its decision, though it has hinted the reasons stand alone. *See Russell v. Acme–Evans Co.*, 51 F.3d 64, 69 (1995) (summary judgment is appropriate only when one of the reasons has not been successfully challenged and that reason,

**3.** Actually, her effort to prove pretext is another story. In her single appellate brief, Brill disputes any claim that she lacked discretion or was ever openly hostile to a client. But those were not Lante's reasons for firing her. Lante fired Brill because of her limited technical skills, her abrasive personality and her plan to leave the company. Lack of discretion was the company's reason for not *promoting* Brill. After jumbling up Lante's reasons, Brill's 1–1/2 page "pretext argument" is largely devoted to the discretion issue (as we say, a non-issue), without a single mention of Lante's discovery that Brill was sending out resumes rather than working on the Timesheets project.

standing alone, would have caused the employer to take the challenged employment action). It matters not: Brill has failed to successfully challenge *any* of Lante's three reasons for firing her, leaving us to conclude that the district court properly dismissed Brill's discharge claim, too.

## IV.

■ Brill's third claim is sexual harassment, a concept "designed to protect working women from the kind of male attentions that can make the workplace hellish for women." *Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430 (7th Cir.1995). In *Baskerville,* we explained that a line exists between workplace vulgarity and actionable harassment. It is not a bright line that separates "intimidating words or acts[,] obscene language or gestures" from "the occasional vulgar banter, tinged with sexual innuendo, of coarse or boorish workers." *Id.* But neither will the line be blurred by confusing the distasteful or inappropriate remarks with the deeply offensive and sexually harassing ones.

■ Just as we concluded in *Baskerville,* this case does not fall within the area of uncertainty. The "locker room" atmosphere in San Jose that Brill painted in her deposition consisted of remarks directed at Gitre, not her, and apparently concerned "how [Gitre] should go about dating other women and how beautiful all the women were at that [bikini] show." At a dinner late one night, something possessed the company's president to describe the breasts of a woman sitting near Gitre but out of his sight. In her brief on appeal, Brill claims that she was "subjected to constant reminders (several times per week) of the incidents in San Jose," but that statement appears without any citation to the record, and we could find no record support for it ourselves.[4]

The San Jose incident undoubtedly was unpleasant to Brill, and it was no doubt disheartening to see the president of the company (if Brill's account is accurate) con-

tribute his own brand of boorishness. But an actionable hostile work environment requires more than descriptions of bikini contestants as "beautiful" and a misguided comment directed at someone else at an after-work dinner. Brill's attempts to buttress her claim with additional incidents—one manager telling her he disapproved of premarital sex and another yelling at her while "towering" over her—do not appear to have anything to do with her sex, and for that matter are not particularly sexual in nature, either. *See EEOC Guidelines,* 29 C.F.R. § 1604.11(a) (defining sexual harassment as "verbal or physical conduct of a sexual nature" that unreasonably interferes with an individual's work performance).

Not only are the three incidents fairly benign, but they are spread over at least a 12–month period. "A handful of comments spread over months is unlikely to have so great an emotional impact as a concentrated or incessant barrage." *Baskerville* at 431. Here we have at most one objectionable incident (the dinner) in a year—not the kind of environment that gives rise to a federal case.

■ But Brill believes that she has another kind of sexual harassment claim: a "quid pro quo" claim, which typically describes harassment occurring when a supervisor conditions a tangible job consequence on an employee's submission to his sexual demands or advances. *See Bryson v. Chicago State Univ.*, 96 F.3d 912, 915 (7th Cir. 1996); *see also EEOC Guidelines,* 29 C.F.R. § 1604.11(a). Here there is no sexual demand or advance whatsoever, making the quid pro quo claim curious to us. Brill's lawyers argue that acting as "one of the boys" (her words) became a term or condition of her employment, and presumably that she was fired for refusing to participate. We decline to blur the line between hostile environment and quid pro quo harassment such that a plaintiff encountering vulgar banter could file either type of claim though no sexual advance was ever issued to her.

---

4. Brill was asked a series of open-ended questions in her deposition that provided her with ample opportunity to describe each incident she believed constituted harassment. That was her chance to make a record capable of surviving a motion for summary judgment, which is why we generally discount-indeed, disregard—an affidavit that is in conflict with a party's deposition testimony. *Russell,* 51 F.3d at 67–68.

There is nothing in the record to suggest that anyone forced Brill to participate in the conversations to which she objects. There even appears to be no dispute that Brill's coworkers apologized to her about the San Jose incident, and the record reveals that the incident was not repeated. But again, if anything these factors are relevant to a hostile environment claim, not a quid pro quo claim.

Finally, Brill's attorneys argue that the district court granted summary judgment while discovery was still open. This hardly concerns us because a party can file a motion for summary judgment at any time, indeed, even before discovery has begun. Fed. R.Civ.P. 56(b); *Chambers v. American Trans Air, Inc.*, 17 F.3d 998, 1002 (7th Cir. 1994). It follows that the motion also may be *decided* by the court during discovery so long as the record reveals no genuine issue of material fact and the non-movant has not sought the protections of Rule 56(f). *See* Fed.R.Civ.P. 56(e), (f).

Brill's concern is that the district court would not have granted summary judgment based upon a fuller record in this case. But the court held a status hearing in mid-December 1995 in which it suggested that the parties work out their discovery disputes in the following week and file any motions to compel "shortly thereafter." By the time Lante moved for summary judgment one month later, no motion to compel had been filed.

Managing the discovery process is the district court's business, which is why we review discovery decisions for abuse of discretion. *Ross v. Black & Decker*, 977 F.2d 1178, 1185 (1992). Brill filed her complaint in March 1995, nine months before Lante moved for summary judgment—ample time, in other words, to prosecute a case. Once Lante filed its motion, the ball was in Brill's court to "come forward with some evidence showing the existence of . . . a factual dispute." *Chambers*, 17 F.3d at 1002; Fed. R.Civ.P. 56(e) ("When a motion for summary judgment is made and supported . . . an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response,

by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial."). At that point the only issue became whether Brill had satisfied her burden under Rule 56. For all of the reasons discussed above, we conclude she did not.

AFFIRMED.

ESCHBACH, Circuit Judge, concurring in the judgment.

I concur with the majority's result. I do not join the opinion, however, because I do not believe that this was the easy, almost frivolous case that the majority makes it out to be. Because this case was presented at the summary judgment stage, I saw it as a difficult case, even though in the end I agree that Ms. Brill did not present sufficient evidence to create any genuine issues of fact that merit a trial. I am also concerned that the majority's discussion (actually dicta) dismisses the possibility that certain circumstances could ever amount to discrimination or sexual harassment, when the only conclusion necessary to the disposition of the appeal is that the facts in this case did not present a genuine question for trial. One example, although not the only one, is the majority's suggestion that because an alleged harasser's remarks are addressed to someone else, although made in the plaintiff's presence and within her hearing, they cannot be considered sexual harassment of the plaintiff. *Supra* at 1274. It seems clear to me that sexual remarks, even though addressed to another, potentially could create a hostile work environment for those who hear them. In my view, the incidents described by Ms. Brill did not amount to sexual harassment, not because the remarks were addressed to someone else in Ms. Brill's presence and within her hearing, but because they were not sufficiently severe or pervasive to amount to sexual harassment under the law of this circuit.