**Kathleen JOHNSON, Plaintiff,**

v.

**SEAGRAM & SONS, INC. and Pernod Ricard USA, Defendant.**

**No. NA 4:02–CV–149–SEB–WGH.**

United States District Court,
S.D. Indiana,
New Albany Division.

March 31, 2004.

Carrie Atkins Barron, Sheila M. Smith, Freking & Betz, Cincinnati, OH, for Plaintiff.

Edwin S. Hopson, John W. Woodard, Jr, Wyatt Tarrant & Combs, Louisville, KY, Van T. Willis, Kightlinger & Gray, LLP, New Albany, IN, John W. Mervilde, Robert M. Kelso, Kightlinger & Gray, Indianapolis, IN, for Defendant.

## I. *Introduction.*

BARKER, District Judge.

This is an employment discrimination action brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, et seq. The plaintiff Kathleen Johnson alleges that her former employer, Pernod Ricard USA (formerly Seagram & Sons, Inc.), discriminated against her on the basis of gender by failing to rehire her after she voluntarily quit her job as a forklift operator. The case comes before the court on Defendant's Motion for Summary Judgment. For the reasons given below, we *GRANT* Defendant's motion.

## II. *Statement of Facts.*

The following facts are either undisputed by the parties or are recited in a light reasonably most favorable to the plaintiff as the party opposing summary judgment.

### A. *Background.*

Plaintiff Kathleen Johnson ("Ms. Johnson") was hired at the Seagram & Sons Distillery in Lawrenceburg, Indiana on June 8, 1998 as a laborer. Seagram & Sons, Inc. sold the Wine and Spirits Division in 2001 to Diageo North America, Inc., but the Lawrenceburg facility was excluded from the sale as it had already been acquired by Pernod Ricard, USA ("Pernod Ricard") in December 2001. Pl. Opp'n Brief at 1; Ex. C. For the purposes of this motion, the Defendant/employer is Pernod Ricard, USA and not Seagram & Sons or Diageo North America, Inc.

Ms. Johnson became a forklift operator after a year at the facility and worked primarily in that capacity until her separation from her job on September 27, 2001. Def.'s Br. in Support of Mot. for Summ. J. ("Def.'s Br.") at 2; Pl.'s Opp'n to Def.'s Mot. for Summ. J. ("Pl.'s Opp'n Br.") at 1. On days when she was not assigned to operate a forklift, she worked as a load coordinator. In either capacity, her supervisor for the last two years was Jerry Higgs ("Higgs"). Johnson Dep. at 32–34. Bill Floyd ("Floyd"), also known as "Red Bird," was the lead dock person and union steward, and Higgs' subordinate. By all accounts, until the day Ms. Johnson quit she had been a good worker, receiving warnings only for tardiness and absence but never for poor work or disciplinary issues. Pl.'s Opp'n Br. at 2.

### B. *Events Giving Rise to this Lawsuit.*

On Thursday, September 27, 2001, Ms. Johnson reported to work on time and was assigned to drive a forklift and load trucks. She went to the garage to choose her forklift—also known as a "Mule"—but found none available. Moreover, the Mule she had counted on using (because she had used it on her previous forklift assignment three days earlier) had been taken by another employee, Leslie, with whom she had quarreled the day before. Displeased, Ms. Johnson proceeded to the shipping dock to look for her supervisor, Higgs, in order to ask him about the protocol for forklift assignments. Higgs, without being specific, seems to have confirmed her idea that it was customary to keep the Mule one is first assigned to, but nevertheless assigned her to "Rhonda's Mule" because Rhonda was absent that day.

Once on her forklift, she drove it over to Floyd, one of the lead dock persons, and asked him to clarify forklift protocol for her by the end of the day. He allegedly responded by saying, indirectly, that he was "tired of babysitting." She confronted him and told him that she did not appreciate his making such a comment about her in public. By this time, Floyd and Johnson's exchange had grown "quite loud" and Floyd insisted that the plaintiff was being stubborn about the issue of Mule protocol simply because of her quarrel with Leslie, the co-worker who was using "her" Mule that day. Angry and upset, Ms. Johnson abruptly grabbed her lunch box, jumped off the forklift, kicked open the exit to the dock, and walked out, exclaiming loudly but to no one in particular, "I quit." Pl.'s Opp'n Memo.; Johnson Dep. 41–48.

Ms. Johnson proceeded to walk downtown and recalls that she felt she had messed up and realized she should not have "walked." She did not, at the time, consider contacting the union hall. She realized she would have to suffer the consequences of her own decisions, regardless of whether she had been right or wrong. Determined not to feel sorry for herself,

she got busy and began job hunting. Def.'s Br.; Johnson Dep. 68; Ex. B.[1]

Ten days later, on Sunday, October 7, a co-worker and friend, Judy McAdams ("McAdams"), called Ms. Johnson at home and encouraged her to try to get her job back because other Seagrams workers had in the past gotten their jobs back after having walked out. Def.'s Br., Johnson Dep. 68. McAdams was referring to Tommy Johnson, an employee who initially had been terminated for bad conduct and absenteeism but was subsequently only suspended and kept his job at Seagrams. The next day—now eleven days after she quit her job—the plaintiff went to the union hall to speak with Greyson Gray ("Gray"), the president of the United Food Commercial Workers' Union, Local 13D. She told him she had quit and had not thought there was a chance of getting her job back until McAdams suggested she try, based on the experience of other Seagrams workers. He listened to her story and said he would contact John Salvagne ("Salvagne"), the Human Resources manager.[2] A week passed without hearing from Gray. On the following Monday, October 15, 2001, Ms. Johnson returned to the union hall and this time filled out and submitted a grievance form. Def.'s Br., Johnson Dep. 58–59; Ex. B.

There are usually three steps in the grievance process. First, the employee's grievance is submitted by the union to the employee's immediate supervisor who responds to it, but there is no meeting. If the union is not satisfied with the first step response, it sends the grievance to the Human Resources department and a meeting between the union and Human Resources is arranged, typically taking place within ten to fifteen working days. The complaining employee may or may not be invited to attend. The employer responds in writing and one of three things happens next: (1) another meeting is arranged to continue working through the dispute; (2) the union proceeds to the third step; or (3) the grievance is dropped if union finds the response satisfactory. The third step involves an evidentiary hearing, one step below an arbitration. According to Gray, "Step Three meetings" have been rare during his tenure as union president. Def.'s Br.; Gray Dep. 10–16.

While Ms. Johnson was waiting for the outcome of her grievance, she received a letter from Salvagne with her final paycheck and the news that her name had been removed from the employee roster effective September 27, 2001. Def.'s Br., Johnson Dep., Ex. A.

Salvagne denied the grievance at the first step and a Step Two meeting was held on October 22, 2001. Def.'s Ex. C. The meeting was attended by Salvagne, his supervisor, Bill Takoch, Gray and the plaintiff. At the meeting, Salvagne told Ms. Johnson he could not rehire her because of the precedent that would set; that is, employees would feel they could quit their jobs with impunity and stay away a week because the company would just take them back the next. Johnson Dep. 70–72; Salvagne Dep. 15–16. Ms. Johnson countered with the information from McAdams that Tommy Johnson had retained his job at the facility after damaging a forklift,

---

**1.** The above facts are recited in both the plaintiff's deposition testimony of the events of September 27, 2001 and the handwritten grievance form she submitted to the union on October 15, 2001 (read by plaintiff into the deposition record at the request of the Defendant's attorney, Robert Kelso). We consider them undisputed.

**2.** Mr. Salvagne has worked in Human Resources at the Seagram Company since 1981, and continues in this capacity for Pernod Ricard, the owner of the Lawrenceburg facility since December 2001. His current title is Director of Industrial Relations. Salvagne Dep. 5–7.

leaving the dock and saying something vulgar to a manager. Johnson Dep. 73.

Salvagne explained that Tommy Johnson and David Richter ("Richter"), another employee named by the plaintiff in the complaint, had both left work under somewhat different circumstances; that is, they had told their supervisors they were leaving and were not stopped or told not to, creating an ambiguous situation which may even have amounted to tacit permission to leave. More to the point, neither had expressed an intention to quit, unlike the plaintiff, whom no one disputes voluntarily quit her job on September 27, 2001. Salvagne Dep. 17, 21.

On March 8, 2002, Pernod Ricard denied her appeal of the grievance and Gray phoned to tell her the union could do nothing more to help her get her job back. Johnson Dep. 78; Gray Dep.

Ms. Johnson filed an EEOC charge of discrimination on April 23, 2002. In the charge, she admits she left work and said "I quit." She alleges that several male employees who left their employment under similar circumstances had succeeded in being reinstated and that the company's failure to rehire her is a case of sex discrimination. Def.'s Ex. D. On May 29, 2002 the EEOC dismissed the charged. Def.'s Ex. E.

### III. *Discussion.*

#### A. *The Standard on Summary Judgment.*

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Lib-*

*erty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir.1998).

On a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Id.* at 322–23, 106 S.Ct. 2548. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548).

■ Summary judgment is not a substitute for a trial on the merits, nor is it a vehicle for resolving factual disputes. *Waldridge,* 24 F.3d at 920. Therefore, in considering a motion for summary judgment, we draw all reasonable inferences in favor of the non-movant. *Venters v. City of Delphi,* 123 F.3d 956, 962 (7th Cir.1997). If genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish her case, summary judgment is

not only appropriate, but mandated. *See Celotex*, 477 U.S. at 322, 106 S.Ct. 2548; *Waldridge*, 24 F.3d at 920.

We note that the Seventh Circuit has determined that the summary judgment standard is to be applied with special scrutiny to employment discrimination cases because intent and credibility are such critical issues. *See Senner v. Northcentral Technical College*, 113 F.3d 750, 757 (7th Cir.1997); *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir.2000). To that end, we carefully review affidavits and depositions for circumstantial proof which, if believed, would show discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules and remain amenable to disposition by summary judgment so long as there is no *genuine* dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.*, 109 F.3d 406, 410 (7th Cir. 1997).

To be clear at the outset of this entry, there are no facts in controversy to preclude our granting summary judgment in favor of the defendant. Consequently, our analysis is based strictly on the presentation of sufficient evidence on the elements of a prima facie Title VII sex discrimination claim.

### B. *Ms. Johnson's Sex Discrimination Claim.*

#### 1. *The Prima Facie Case.*

Title VII makes it unlawful for an employer to terminate an employee because of her sex. 42 U.S.C. § 2000e–2(a)(1). Since Ms. Johnson has no direct evidence of discrimination, she may prove her case indirectly through the burden-shifting method outlined in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817,

36 L.Ed.2d 668 (1973); *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000).

If Ms. Johnson presents evidence sufficient to establish a prima facie case, she will have raised a presumption of discrimination which Pernod Ricard must rebut by producing evidence of a legitimate, nondiscriminatory explanation of its adverse employment action. Once it does, Ms. Johnson must establish that the reasons proffered by the defendant were pretextual. To prove pretext, Ms. Johnson must present admissible evidence from which a trier of fact may reasonably infer that her gender played a role in the challenged action or that the employer offered a phoney explanation for its adverse employment action. *See Freeman v. Madison Metropolitan School Dist.*, 231 F.3d 374, (7th Cir.2000).

Analytically, this employment discrimination claim presents some unusual twists. For example, the defendant briefed its motion for summary judgment as a "discriminatory discharge" case without there ever having been an allegation of a discharge. Indeed, the plaintiff never suggests that her quitting her job was, in reality, a constructive discharge, nor do any facts lead the court to infer a constructive discharge. The plaintiff correctly points out the error[3] and briefs her response as a "failure to rehire" claim. However, this is not a typical failure to rehire claim since those most often occur in the context of a "RIF," or reduction-in-force, and a termination by the employer logically precedes its failure to rehire the employee. Again, we have no termination or lay-off preceding the failure to rehire because the plaintiff voluntarily quit her job and the parties do not dispute this fact. Finally, this claim is not analogous to a typical "failure to hire" claim because the plaintiff does not allege that as

**3.** Pl.'s Opp'n Brief at 9, fn. 3.

a qualified female employee she was deliberately bypassed in favor of a similarly qualified male.

■ Notwithstanding the analytical conundrum presented by Ms. Johnson's claim, we shall proceed to consider whether she has established the following prima facie case for a failure to rehire claim:

1. She was a member of a protected group;

2. She was subjected to an adverse employment decision;

3. She was qualified for the position;

4. She was replaced by someone outside the protected group; or a similarly-situated employee outside the protected group received more favorable treatment.

See *Paluck v. Gooding Rubber Co.,* 221 F.3d 1003, 1012 (7th Cir.2000); *Cole v. Greater Clark County Schools,* 2004 WL 350446 (S.D.Ind.2004) (Barker, J.).

The parties are at odds over the third and fourth elements. As to whether Ms. Johnson was qualified for the job for which she was not rehired, the defendant contends that the manner in which Ms. Johnson left her employment is highly relevant to the issue of her qualifications. The plaintiff, on the other hand, would like us to disregard the events of September 27th and focus only on Ms. Johnson's objective qualifications at the time she was not rehired, arguing that her good work record during three years at the facility should be the sole basis for her qualifications. We consider the events of September 27th relevant for one or both of the following reasons: (1) the fact that Ms. Johnson voluntarily quit her job and was not heard from for eleven days distinguishes her from the men she compares herself to[4] because those employees, however recalcitrant, did not explicitly quit their jobs and were not expunged from the roster of employees; and (2) the manner of her leaving her job is relevant to the employer's legitimate, non-discriminatory personnel decision not to rehire the plaintiff.

### 2. *Similarly Situated Employees.*

■ In a typical failure to rehire case, the prima facie case requires that the employer either hire or continue to seek to hire someone of a different sex. *Von Zuckerstein v. Argonne Nat'l Lab.,* 984 F.2d 1467, 1474 (7th Cir.1993). In the case before us, the plaintiff does not allege that the discriminatory conduct by the employer was its hiring a similarly situated male for the job rather than rehiring her. Rather, Ms. Johnson contends that three male employees of the Lawrenceburg facility—Thomas Johnson, Owen Cross and David Richter—had, before the events that gave rise to this lawsuit, been rehired under arguably similar factual circumstances. This presents a less-than-usual analysis of the fourth element in the prima facie discrimination claim. However, there exists caselaw in the RIF context of a failure-to-hire claim which employs the following analysis: whether a comparable, non-protected person was retained during a RIF.[5] For this reason, we believe the standard

---

4. We do not find persuasive the plaintiff's argument that the fact that the plaintiff said the words "I quit" when she left the Lawrenceburg facility is irrelevant to the issue of similarity. *See* Pl.'s Opp'n Br. at 14. Moreover, it is relevant to the employer's reason for not rehiring her. The plaintiff argues that it makes no sense for an employer to retain a "problem employee" who does not quit and then to fail to rehire a "good" employee who walked off the job and was not heard from for eleven days. She then demands the defendant explain its illogical decision, *id.* at 15, demonstrating that she misunderstands the burden on the defendant to rebut the prima facie case should she be able to establish one. *See* infra at 13.

5. *Kulumani v. Blue Cross and Blue Shield Ass'n,* 224 F.3d 681 (7th Cir.2000).

for a "comparable, non-protected person" is someone who voluntarily quit his job at the Lawrenceburg facility and nevertheless retained his job.

Owen Cross is not comparable to Ms. Johnson because he never voluntarily quit his job: he was laid off by the employer, and although he bypassed a recall in November 1996 and in January 1997, he remained on recall status and responded to a recall in September 1997. Def.'s Br., Undisputed Facts ¶¶ 41–42. David Richter left during his shift on August 31, 2000 and was allowed to return to work because Salvagne faulted the supervisor for not being clear on whether Richter had permission to leave or not. Def.'s Br. at 7; Salvagne Dep. 18. Plaintiff concedes this fact but argues that what makes Richter similar to herself is that they both left work *in frustration* and without permission. However, without determining whether Richter had permission to leave or not, what strikes us as more to the point is whether the employee left with the intention of quitting, and this intention was expressed by Ms. Johnson but not by Richter. Finally, Tommy Johnson's situation is the most factually similar for the purposes of the prima facie case. On November 5, 1999, the Friday before Mr. Johnson was to begin a suspension for absenteeism, he announced he was leaving during an overtime shift and walked out of the facility. He was terminated for just cause but Salvagne changed the termination to a suspension between the second and third steps of the grievance process. Because we are reluctant to dismiss a case at the prima facie stage for failure to provide comparative evidence, we shall accept that Mr. Johnson had no intention of returning to work until he asked the union to help him get his job back in order consider him comparable to the plaintiff.

The plaintiff has met her burden, however tenuously, of establishing a prima facie case.

C. *Legitimate, Non–Discriminatory Reasons for Pernod Ricard's Actions.*

According to Salvagne, the plaintiff was not rehired because she had walked off the job despite instructions not to do so, declared she was quitting, and failed to preserve her employment status even after she received her last paycheck from the company. To have rehired her would have set a precedent for quitting with impunity. Johnson Dep. 70–72; Salvagne Dep. 15–16.

The defendant's burden to furnish a legitimate, non-discriminatory reason for its adverse action is light; the employer need not persuade the court it was actually motivated by the reason it gives and the mere articulation of the reason rebuts the prima facie case and shifts the burden back to the plaintiff to prove pretext. *Jones v. Union Pacific R.R. Co.,* 302 F.3d 735, 742 (7th Cir.2002).

Short of proving by a preponderance of the evidence that Pernod Ricard has lied [6], we need only examine whether Pernod Ricard's reason was honest, *Brill v. Lante Corp.,* 119 F.3d 1266, 1273 (7th Cir.1997), and we need not act as a "super-personnel department" and second-guess its business judgment. *Millbrook v. IBP, Inc.,* 280 F.3d 1169, 1181 (7th Cir.2002) (*quoting Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Servs.,* 165 F.3d 1321, 1330 (10th Cir.1999)). Salvagne testified credibly to the reason for not granting Ms. Johnson's appeal and rehiring her despite the plaintiff's arguing that it is so illogical as to be pretextual. In addition, Gray also testified that the union declined to pursue

6. Pretext "means a lie, specifically a phony reason for [taking] some action." *O'Neal v.* *City of New Albany,* 293 F.3d 998, 1005 (7th Cir.2002); *Cole* 2004 WL 350446 *11.

Ms. Johnson's grievance past Step Two because the plaintiff had no case given the fact that she had quit. Gray Dep. 44. To prove pretext, Ms. Johnson would need to present evidence from which a jury might reasonably infer that the reason had no basis in fact, or if it did have a basis in fact that it was not the real reason, or that it was the real reason but it was insufficient to warrant the termination. *Johnson v. City of Fort Wayne,* 91 F.3d 922, 931 (7th Cir.1996); *Grayson v. O'Neill,* 308 F.3d 808, 820 (7th Cir., 2002). Ms. Johnson simply asserts that the manner in which she left her job—walking off the job during her shift and declaring "I quit" and not subsequently ever returning to work—was insufficient to motivate Pernod Ricard's decision because they had allowed more troublesome employees to retain their employment on past occasions. Pl.'s Opp'n Br. at 19. We simply cannot substitute our judgment for that of the Human Resources department in November 1999 when it allowed Tommy Johnson to return to the facility; more than just issues of personality determine employment decisions, namely, the economy, the personnel roster at the time, etc. We can only say that when Pernod Ricard chose not to rehire Ms. Johnson, the reason was not so outlandish as to suspect it is a lie. Consequently, we find the defendant has satisfied its burden of production and the plaintiff has failed to satisfy her burden of persuasion on pretext.

## IV. *Conclusion.*

For the reasons given above, the plaintiff has not satisfied the legal requirements necessary to establish her claim of Title VII sex discrimination. Accordingly, we *GRANT* Defendant's Motion for Summary Judgment.