Tara GORDON, Plaintiff,

v.

SOUTHERN BELLS, INC., Defendant.

No. IP 98–1450C–B/S.

United States District Court,
S.D. Indiana,
Indianapolis Division.

Sept. 30, 1999.

Charles A. Carlock, Gannon & Ciyou, Indianapolis, IN, for plaintiff.

S. Douglas Trolson, Hoffman Drewry Hancock Simmons, Indianapolis, IN, for defendant.

## ENTRY GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BARKER, Chief Judge.

Plaintiff, Tara Gordon ("Gordon"), alleges that her former employer, Defendant Southern Bells, Inc.· ("Southern Bells"), discriminated against her on the basis of her sex through allegedly pervasive sexually harassing conduct in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e *et seq* ("Title VII"), and by retaliating against Gordon for opposing Southern Bells' unlawful conduct and for participating in an investigation or proceeding under Title VII, in vio-

lation of Title VII § 2000e–3. Southern Bells responds that the alleged conduct did not in fact occur, and if it did occur, Defendant disputes Gordon's characterization of the conduct, claims it took prompt remedial action, and that Gordon suffered no economic harm. Southern Bells contends that Gordon has failed to provide sufficient evidence necessary to support her claims and has filed for Summary Judgment under Federal Rule of Civil Procedure 56. For the reasons discussed below, Southern Bells' motion must be *GRANTED* with respect to Gordon's claim for retaliation and *DENIED* with respect to Gordon's claim of a hostile work environment.

### Factual Background

Southern Bells is a corporation that owns and operates a chain of Taco Bell restaurants throughout Central and Southern Indiana. *See* Joint Statement of Undisputed Facts ¶ 2 ("Joint Statement").[1] Gordon began working for Southern Bells as a salaried employee on June 4, 1998. *See id.* ¶¶ 4, 15. Gordon was informed at the interview that Southern Bells was growing rapidly and was looking for more local-level support with stores "doing such things as visiting local chambers of commerce and mayor offices in the Southern Bells area." *Id.* ¶ 6.

Gordon was told when she was hired that she would be working with Landers, Southern Bells' advertising agency. *See* Gordon Deposition at 39–40 ("Dep."). Landers was responsible for purchasing local media advertising, served as a liaison between Southern Bells and Taco Bell

1. Gordon objects to the motion for summary judgment due to Southern Bells' failure to comply with Local Rule 56.1. *See* Plaintiff's Response to Statement of Material Facts at 1 n. 1. Judge Tinder has recently written an excellent entry that identifies some of L.R. 56.1's ambiguities and attempts to clarify them. *See Pike v. Caldera,* Docket No. IP 98–0204–C–T/G, Entry Discussing Pending Motions to Strike and Motions for Leave (S.D.Ind. Sept. 7, 1999) (available from the Clerk's office for the Southern District or from our website at <http://www.insd.uscourts.gov>). We note here that Southern

Bells has made no apparent effort to comply with L.R. 56.1 and thus has made our job of establishing the relevant material facts much more difficult. However, the purpose of the rule is simply to "notify the parties of the factual support for their respective arguments regarding summary judgment." *Mirocha v. TRW, Inc.,* 805 F.Supp. 663, 675 (S.D.Ind. 1992). Although this process has been made more difficult due to Southern Bells' noncompliance, the parties and we have been able to identify the relevant material facts. Therefore, Plaintiff's objection to the motion for summary judgment is *DENIED.*

Corporate ("Taco Bell") in marketing and advertising matters and assisted Southern Bells in the administration of marketing programs from Taco Bell. *See* Joint Statement ¶¶ 8; 10. In her position as Southern Bells' liaison to Landers, Gordon coordinated with Landers to determine the individual stores' local media advertising needs. *See id.* ¶ 9.

The marketing and promotional materials for the stores were supplied by both Taco Bell and Landers. *See id.* ¶¶ 11, 13. With respect to the Taco Bell materials, Gordon had little involvement in approving the use of the promotional materials; rather, she would coordinate with Landers who actually placed the orders for the local stores. *See id.* ¶ 12. Once the orders were placed, Gordon would review the invoices and approve them for payment by Southern Bells. *See id.* With respect to the Landers promotional materials, Gordon also had limited involvement in determining whether Southern Bells would purchase the materials from Landers, or develop them independently. *See id.* ¶ 13. In addition to these duties, Gordon worked with local store managers on promotional events and on the use of promotional materials purchased by Southern Bells for the local stores. *See id.* ¶ 14. She coordinated promotional material, advertising and special events for new store openings, and relationships with local schools. *See id.* Gordon was also responsible for tracking promotions and publishing a Southern Bells newsletter. *See id.*

In late July 1998, Gordon met with Southern Bells' president and co-owner, Craig Fenneman ("Fenneman"), to complain that she had been sexually harassed by Southern Bells' other co-owner, and vice president, Charlie Brown ("Brown"). *See id.* ¶ 20. At this meeting, Gordon complained of two incidents involving

Brown, both of which were at after-work-hours events where Southern Bells picked up the tab. *See* Defendant Findings of Fact ¶ 13 ("Findings"); Gordon Affidavit ¶¶ 1, 8 ("Gordon Aff."). The first occurred sometime in June 1998, *see* Dep. at 214, and involved Brown, Gordon, and two other female employees, Tina Sneed ("Sneed") and Mary Beatty ("Beatty"). *See* Findings ¶ 14. Brown told Gordon that she "really look[ed] nice," and she "could tell by the tone of his voice" that Brown was attracted to her. Gordon Aff. ¶ 2. Gordon felt this comment was inappropriate, but "was not overly offended by this isolated comment." *Id.* Later in the evening, Brown asked Gordon if he could "measure himself back to back" with her. *Id.* ¶ 3. This request made Gordon uncomfortable, but she acquiesced because "he was the owner of the company and because [she] was relatively new to the company and didn't want to make too many waves early in [her] employment with [Southern Bells]." *Id.*

Over the course of the June 1998 encounter, Brown repeatedly requested that Gordon remove her bra. *See* Findings ¶ 14; Dep. at 202. Finally, Brown swore at Gordon, saying "Goddamn it you are going to take [it or that bra] off." Findings ¶ 14; Gordon Aff. ¶ 4. It is unclear whether Brown at this point ordered Gordon to go to the bathroom with Sneed, *see* Dep. at 202, or whether she simply chose to go to the bathroom, *see* Gordon Aff. ¶ 4, but either way, Brown told Gordon not to return from the bathroom wearing the bra. *See* Dep. at 202, 208–09. While in the bathroom, Gordon claims that Sneed told her to comply with Brown's request because he wanted her to take it off, and told her that she should do it or Brown would get mad. *See id.* at 208.[2] Gordon felt

---

**2.** We are not allowed to consider evidence that would be inadmissible at trial in a summary judgment motion. *See Minor v. Ivy Tech State College,* 174 F.3d 855, 856 (7th Cir.1999); *Eisenstadt v. Centel Corp.,* 113 F.3d 738, 742 (7th Cir.1997). If Sneed's statement was being offered for the truth of the matter

asserted, it would be inadmissible hearsay. However, if Sneed's statement is offered to explain Gordon's state of mind or perceptions, it would likely be admissible at trial as evidence of an objective reaction to the situation. *See* Fed.R.Evid. 801(c) and 803(1).

"scared and intimidated by Brown's comments" and, when Gordon returned to the table, she had tucked the bra straps into her bra so that it would appear that she had taken it off. *See id.* at 208–09; Gordon Aff. ¶ 5.

Later that same evening, Brown insisted that he and his three female employees go around the table and discuss their sexual fantasies and fetishes. *See* Dep. at 206–08; Gordon Aff. ¶ 6. Brown then described several of his fantasies and an incident with an ex-girlfriend. *See* Dep. at 206–08; Gordon Aff. ¶ 16. Brown kept insisting that the women reveal their fantasies; according to Gordon, "he was very forceful, 'You're going to tell.'" Dep. at 206. Gordon initially told Brown and the other women that she did not have any such fantasies, but after Brown "wouldn't drop it," she shared something with the group. *Id.* at 207. As a result of these conversations, Gordon felt "embarrassed and very nervous and uncomfortable around Brown." Gordon Aff. ¶ 6.

The second incident occurred sometime in July 1998, *see* Dep. at 214, several weeks after the first incident. *See* Findings ¶ 18; Gordon Aff. ¶ 8. This incident involved Gordon, Brown, and some other, unnamed Southern Bells employees and occurred at an Indianapolis comedy club where Southern Bells again picked up the tab. *See* Findings ¶ 18; Gordon Aff. ¶ 8. At this event, Brown began drinking excessively and told Gordon and her co-workers that he intended to "get drunk tonight." Gordon Aff. ¶ 8. Although Gordon attempted to position herself at the end of the table away from Brown, he later moved next to her. *See id.* ¶ 9. Brown

whispered to Gordon that her shoes made her look tall and asked her where she lived and whether she had ever been married. *See* Findings ¶ 18; Dep. at 212. Brown also rubbed Gordon's foot with his foot for approximately five seconds, *see* Findings ¶ 18; Dep. at 212, which, she said, made her feel uncomfortable, *see* Findings ¶ 18; Gordon Aff. ¶ 11, prompting her to attempt to diffuse the situation by being evasive and short with her answers and move away from Brown. *See* Gordon Aff. ¶ 11.

Shortly after this second incident, Gordon went to Fenneman and complained about Brown's actions. *See* Gordon Aff. ¶ 13.[3] Prior to discussing these incidents with Fenneman, Gordon had told only a co-worker, James Hinkle. *See* Dep. at 215. Unaware of any sexual harassment policy, Gordon felt that reports about one owner should be made to the other owner. *See* Gordon Aff. ¶ 14. Fenneman responded by asking whether Brown had been drinking, although he also acknowledged that this fact did not matter. *See* Dep. at 233. Gordon also says that Fenneman seemed shocked, indicating that he would "talk to [Brown] about it and we can have formal write-up session with you present." *Id.*[4] While Southern Bells disputes whether these alleged incidents occurred, it admits that Brown met with Gordon the day following her meeting with Fenneman, that Brown told her that he "had no idea that those things were offensive," *see* Dep. at 239, and that he apologized for "anything he might have said or done to offend" her. Joint Statement ¶ 21. Gordon, however, did not feel that Brown's apology was sincere, *see* Dep. at 239, though she

---

**3.** Gordon also asserts that, by this time, she had heard rumors about Brown's involvement in an extramarital, inter-office affair. *See* Gordon Aff. ¶ 12. Southern Bells objects to this statement as hearsay, irrelevant, and prejudicial. *See* Defendant Reply Brief in Support of Motion for Summary Judgment at 2 ("Def.Reply"). The admissibility of this evidence will be discussed *infra.*

**4.** Southern Bells appears to dispute that these incidents actually occurred. *See* Findings

¶ 20. This denial is based upon Fenneman's alleged investigation of Gordon's allegations by interviewing Brown, Sneed and Beatty. Defendant's Answer to Plaintiff's Interrogatory 8. Gordon objects to these conversations as hearsay and states that we must accept her version of the events for the purposes of summary judgment. *See* Plaintiff's Response to Statement of Material Facts ¶ 20. The admissibility of this evidence will also be discussed *infra.*

does not allege that she was subject to any further harassment by Brown. *See* Joint Statement ¶ 22.

Gordon also complains of incidents involving Richard Ash–Simpson ("Ash–Simpson"), a district manager with Southern Bells. *See* Dep. at 217–31; Gordon Aff. ¶ 19. Ash–Simpson was responsible for supervising the Restaurant General Managers for the restaurants in his district. *See* Joint Statement ¶ 18. He reported to the Director of Operations, who in turn reported directly to Fenneman and Brown. *See id.* Ash–Simpson had "no supervisory authority over Gordon" and had "no authority to unilaterally take any personnel action with respect to Gordon including but not limited to hire, discharge, promotion, demotion, transfer, wage increase or reduction, or disciplinary action, and did not participate in any evaluation or review of Gordon's job performance." *Id.* ¶ 19 (punctuation added).

Gordon describes one occasion in late June or July 1998, close to the date of the first incident with Brown, *see* Dep. at 218, when she spent the day driving with Ash–Simpson to visit the restaurants in his district. *See id.* Ash–Simpson, who is an African–American, *see* Dep. at 218, told Gordon that she was beautiful and "tried to put a guilt trip on [Gordon] that [she] would never date a black guy ... trying to almost make [Gordon] feel like [she] was a racist." *Id.* He asked her questions about her personal life, such as whether she had a boyfriend, *see id.* at 218–19, told her that she was gorgeous and that "a gorgeous girl like [her] should be married." *Id.* at 219. He told her that she had nice legs and suggested several times during the day that they should go out together. *See id.* at 218, 223, 230. Gordon's response was to "laugh things like that off;" she did not tell Ash–Simpson to stop making such comments, although she felt that they were offensive. *Id.* at 221. Gordon claims that she reacted in this way because "if I was on my own time, say at the mall, and someone had approached me with things like that I found offensive, I would have told them to buzz off. But this was differ-

ent, this was my job, and I was scared; and I was new." *Id.* She hoped that Ash–Simpson would "get the hint" if she did not respond to his advances. *Id.* at 221–22. She "was scared because of ... the incident that [she] had been through a few nights prior with [Brown]." *Id.* at 222.

Gordon also makes several other specific allegations regarding conduct by Ash–Simpson. One time, although no date is provided, Gordon claims that Ash–Simpson "cornered" her and Sneed into a storage closet by putting out his hands to block them in. *See id.* at 220. Gordon apparently got away from him by ducking under his arms. *See id.* She also complains that on an unspecified date Ash–Simpson asked her out while they were at one of the stores. *See id.* at 223. On another occasion, again no date is provided, he told Gordon that she had a "nice ass." *Id.* at 221.

In addition, Gordon makes general allegations about things that Ash–Simpson would say to her that she felt were inappropriate and made her uncomfortable. She asserts that he frequently would call "hey gorgeous," when he came into the office. *Id.* at 220. She claims that he repeatedly asked her out while at work. *See id.* at 223. She asserts generally that he made repeated sexual advances over several weeks. *See* Gordon Aff. ¶ 19. She also claims that over the entire course of her employment, probably eight or nine times, he told her that he "liked her legs." *Id.* at 224–25. While Gordon never told Ash–Simpson to stop making these comments, *see id.* at 225, and never explicitly told him no when he asked her out, *see id.* at 228, 231, they made her uncomfortable. *See id.* at 224 ("when you combine a lot of those actions together, it's scary. I don't want to deal with that. I don't need to be stressed out about that."). Before reporting these incidents to Fenneman, as we will discuss below, Gordon believes that she mentioned to Sneed that Ash–Simpson was "pushing it" on one occasion. *Id.* at 221.

Southern Bells does not directly deny that these events occurred. Instead, Southern Bells asserts that it had a written sexual harassment policy in place, a policy available in an employee handbook and an employees memorandum.[5] *See* Fenneman Affidavit ¶ 4 ("Fenneman Aff."); Fenneman Aff. Exhibit A, at 17; Fenneman Aff. Exhibit C. Included with this policy is a form for use in filing sexual harassment complaints. *See* Fenneman Aff. ¶ 5. Southern Bells also claims that these forms are made available in employee break rooms. *See id.* ¶ 5. According to the Employee handbook, employees who have been subject to harassment "should report the situation immediately to a manager, fill in the form provided to you in the break area of your restaurant, or call the Human Resource Department at the main office." Fenneman Aff.Ex. A, at 17. The employees memorandum directs employees to report harassment "to the office" by using one of the provided forms. Fenneman Aff.Ex. C. Gordon claims that she was never provided with either the handbook or the employee's memorandum and was unaware of the policy's existence. *See* Gordon Aff. ¶ 7. She also denies that any such forms were available in the break room or anywhere else in the office. *See id.*

In mid-August 1998, Gordon consulted an attorney who sent a letter of representation on her behalf to Fenneman. *See id.*

¶ 16. On the day Fenneman received that letter, Gordon asserts that he called Gordon into his office. *See id.* ¶ 19.[6] Gordon maintains that Fenneman informed her "in a loud and hostile tone" that he had received her attorney's letter. *See* Dep. at 183; Gordon Aff. ¶ 17. Fenneman told Gordon that he had heard "that you don't like it here and that you don't like us; and you need to decide what you want to do." Dep. at 183–84. She took these comments as an invitation to resign. *See* Gordon Aff. ¶ 17.[7] Fenneman allegedly also told Gordon that he did not believe the incidents involving Brown had really happened. *See* Dep. at 184.

It was at this point that Gordon attempted to tell Fenneman about the incidents with Ash–Simpson, saying that "someone else here is bothering me." *Id.* at 237. Fenneman responded by telling Gordon, "We have forms for that that you fill out." *Id.* Gordon claims that Fenneman was very hostile towards her when he told her about the harassment forms and indicated that he was unwilling to listen to her complaint about Ash–Simpson. *See id.* Although Gordon claims to have asked Fenneman for such a form, he never provided her with one. *See id.* at 237–38. Southern Bells does not specifically dispute that Fenneman made such a statement to Gordon, but states instead that "it was understandable he would defer re-

5. Southern Bells claims that the policy is also contained in the manager's handbook, (Fenneman Aff. Exhibit B). However, we have found no reference to any anti-harassment policy in Exhibit B.

6. Southern Bells asserts that Gordon's deposition testimony and her affidavit are contradictory concerning her report to Fenneman about Ash–Simpson. *See* Def. Reply at 4. Southern Bells asserts that Gordon initially claims to have told Fenneman of Ash–Simpson when she told Fenneman of Brown's behavior. *See id.* (citing Dep. at 235–236, 238). However, during her deposition, Gordon specifically denies telling Fenneman about Ash–Simpson at the initial meeting about Brown's actions. *See* Dep. at 234. While Gordon's deposition does seem to be contradictory, it also appears that defense

counsel's questioning may have confused her about the time and days of specific conversations about which she was being asked. Therefore, we will allow Gordon to clarify her deposition testimony with her affidavit. *See Russell v. Acme–Evans Co.*, 51 F.3d 64, 67–68 (7th Cir.1995).

7. Southern Bells claims that this statement in Gordon's affidavit is inconsistent with portions of her deposition indicating she was considering leaving anyway. *See* Def. Reply at 6 (citing Dep. at 185–86, 234, 239). However, these statements do not necessarily contradict Gordon's stated belief that Fenneman was asking her to resign, especially in the context of a meeting where Fenneman had already minimized Gordon's allegations against Brown.

sponsibility for someone other than the vice-president to the sexual harassment procedure." Def. Reply at 5. At the end of this meeting, Fenneman apparently told Gordon that he wanted her "out in the field" and "out of this office." Dep. at 184. Gordon inferred from Fenneman's tone and the content of the meeting that Fenneman was mad at her for consulting an attorney. *See* Gordon Aff. ¶ 20. Given these responses, Gordon also concluded "that Fenneman had no intentions of helping [her] resolv[e] these problems, and [she] therefore did not address these situations with him again." Gordon Aff. ¶ 23.

Following this meeting between Gordon and Fenneman, Gordon claims that Southern Bells retaliated against her by changing her work-related responsibilities, first, by excluding Gordon from monthly managers' meetings. Southern Bells held monthly managers' meetings and the agenda for these meetings regularly included presentations by "[s]enior staff." *See* Fenneman Aff. ¶ 6; Gordon Aff. ¶ 15. Other individuals would be called upon to make presentations "based on current topical emphasis, interest and need." Fenneman Aff. ¶ 6.

The parties agree that Gordon attended and made presentations at the June and July managers' meetings and that she did not attend or present at the August or September managers' meetings. *See* Dep. at 173; Fenneman Aff. ¶ 6.[8] Both sides also agree that Gordon's July presentation was about upcoming promotions. *See* Dep. at 168; Fenneman Aff. ¶ 6. Gordon claims her June presentation related to the same topic, *see* Dep. at 167; Gordon Aff. ¶ 15, though Southern Bells states that the June presentation was simply to introduce Gordon and describe her newly created position. *See* Fenneman Aff. ¶ 6.

Gordon claims that she was initially considered senior staff and was told that she would attend all monthly managers' meetings. *See* Gordon Aff. ¶¶ 15, 21. Therefore, she claims, she was excluded only

from the August and September meetings after Fenneman received her letter of representation from Gordon's attorney. *See id.* ¶ 21. In contrast, Fenneman states that "[s]enior staff includes the Vice President, the Controller, the General Manager, the Real Estate Manager, and the Director of Human Resources. Tara Gordon was not senior staff." Fenneman Aff. ¶ 8 (punctuation added). Thus, Southern Bells claims that Gordon attended the June and July meetings only because there was topical information for her to present, and she was not at the August or September meetings because no such presentation by her was needed. *See id.* ¶ 6.

Gordon also contends that Southern Bells retaliated by taking away her responsibility for "promotions tracking." These duties required Gordon to take forms that the store managers had filled out, indicating the number of promotional items that had been sold, and enter the information into the computer, generating reports, charts and graphs, and distribute these to the managers. *See* Dep. at 188–91; Findings ¶ 42. Both parties agree that as of August 1998, Gordon no longer was responsible for "promotions tracking." *See* Dep. at 188; Findings ¶ 41. They also agree that in June and July 1998, Gordon spent approximately thirty percent of her time performing "promotions tracking." *See* Dep. at 191; Findings ¶ 41. Gordon admits that these duties were removed at the same time Fenneman told her that he wanted her to spend less time in the office and more time in the field. *See* Dep. at 192. Gordon also admits that she did not consider the removal of these duties a demotion. *See id.* at 190. Southern Bells claims that Gordon's position required her to "spend increasingly more time out of the office to coordinate upcoming advertising and promotions with the [store general managers], and the district managers, and community leaders for their support of

---

8. Gordon also apparently made a presentation at a quarterly, all-store meeting in Brown

County in August 1998. *See* Dep. at 166–67.

local restaurants and promotions." Fenneman Aff. ¶ 7.

Gordon next contends that Southern Bells retaliated against her by requiring her to submit written daily "action reports." Dep. at 181. These reports required Gordon to "specifically document where [she] would be at all times." Gordon Aff. ¶ 27. Both parties agree that this requirement began either the day Fenneman received the letter from Gordon's attorney, or soon thereafter. *See* Dep. at 182–83; Findings ¶ 44. In her deposition, Gordon states that only she and Bob Heck, the two people with primary traveling responsibilities, were required to submit such reports. *See* Dep. at 181–82. However, she states in her affidavit that she was the only person required to keep such logs. *See* Gordon Aff. ¶ 27. Moreover, she claims in her affidavit that prior to the receipt of her letter, she did not know of any Southern Bells employee who was required to submit written reports. *See id.* ¶ 26. In addition, she asserts that Fenneman had never expressed concern over her whereabouts. *See id.* In fact, prior to the receipt of her attorney's letter, she claims there was not even an oral reporting system in place regarding her daily activities. *See id.* Gordon maintains that Fenneman never seemed to care where she was or what she was doing prior to receiving her attorney's letter. *See* Dep. at 179. She believed that this written reporting system was "much more restrictive and humiliating" and "was designed to aggravate [her] into quitting." Gordon Aff. ¶¶ 27, 28.

Southern Bells responds that Fenneman's practice as President of Southern Bells was always to require written action reports from all senior staff, usually on a bi-weekly basis. *See* Fenneman Aff. ¶ 8. Since they did not consider Gordon senior staff, she did not have to provide such reports. *See id.* They do, however, claim that she provided oral reports to both Fenneman and Brown. *See id.* They contend that as her responsibilities outside of the office grew, and her oral reports became less satisfactory, Fenneman began requiring "written reports similar to senior staff." *See id.*

Finally, Gordon alleges that Fenneman and Brown "ostracized," "harassed" and "cut [her] off" from all business-related communications, Gordon Aff. ¶¶ 24, 27, citing for support the same facts discussed above. She claims that Fenneman and Brown stopped providing her with any new promotional projects to develop, *see* Gordon Aff. ¶ 25, though no evidence was cited in support of this claim. Southern Bells asserts that no evidence is available to establish that either Fenneman or Brown ever gave Gordon such assignments, and "it is more likely she was to see what needed to be done and find a way to accomplish it." Def. Reply at 8. Gordon references two or three "hostile phone calls" from Fenneman to "check up" on her and "target her" during the business day. *See* Dep. at 174–75, 176. In these calls, Fenneman asked where she was, what she had done so far on a particular day and what she would be doing next. *See id.* at 174–75. Gordon states that having deposited her daily action reports in Fenneman's mailbox, he could have checked those reports if he really were interested in Gordon's daily activities. *See id.* at 177.

Gordon detailed one of these phone calls. *See* Dep. Exhibits 30, 31. On September 10, 1998, Gordon reports that Fenneman called her on her car phone, using an accusing and hostile tone and acting "all shitty," accusing her of "running around" and "goofing off." *Id.* Fenneman allegedly stated that store managers had informed him that Gordon had not returned their calls. *See id.* Gordon responded that she returned every phone call, though she did not disagree that managers had complained or that they said Gordon had not returned their calls. *See* Dep. at 179. Gordon asserts that she later spoke with Fenneman about his call and told him that she "didn't appreciate his accusing and hostile manner." *Id.* at 178–79.

Southern Bells responds that corporate staff are generally expected to keep their supervisors informed about their whereabouts and activities during normal business hours. *See* Fenneman Aff. ¶ 9. This is usually accomplished by advising the receptionist as to their whereabouts and expected time of return. *See id.* Gordon admits that she does not know whether other employees keep the receptionist informed when they are out of the office. *See* Dep. at 177. She also admits that Fenneman would call the receptionist "on a regular basis ... and ask questions [regarding] where people were," *id.* at 176, and that this particular phone call had been prompted by Fenneman's call to the receptionist who did not know at the time where Gordon was. *See id.* Fenneman asserts that it is "unacceptable for salaried corporate staff to be unaccounted for during normal business hours." Fenneman Aff. ¶ 9. He also indicates that he had become increasingly frustrated with Gordon's "lack of accountability, and her resistance to keeping [him] advised of her activities." *Id.* ¶ 10.

On September 14, 1998, Gordon filed a charge of sexual harassment and retaliation with the Equal Employment Opportunity Commission ("EEOC"), *see* Compl. Exhibit A, claiming that she had experienced sexual harassment in the forms described above and that the Company had retaliated against her by "removing all duties and responsibilities from my workload and completely ignoring me." *Id.* On September 28, 1998, Gordon resigned from Southern Bells, effective that same day, via a letter she left in Fenneman's mailbox. *See* Joint Statement ¶ 26.

## Discussion

### A. Summary Judgment Standards

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). A genuine issue of ma-

terial fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Eiland v. Trinity Hosp.,* 150 F.3d 747, 750 (7th Cir.1998).

With a motion for summary judgment, the burden rests on the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment. *Id.* at 322–23, 106 S.Ct. 2548. "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her." *Waldridge v. American Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir.1994) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Celotex,* 477 U.S. at 322–24, 106 S.Ct. 2548; *Anderson,* 477 U.S. at 249–52, 106 S.Ct. 2505).

In considering a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-movant. *See Spraying Sys. Co. v. Delavan, Inc.,* 975 F.2d 387, 392 (7th Cir.1992). Thus, if genuine doubts remain, and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enters., Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir.1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir.1989). However, if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his case, summary judgment is not only appropriate, but also required. *See Celotex,* 477

U.S. at 322, 106 S.Ct. 2548; *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir.1989).

## B. Hostile Workplace Environment Claim.

Title VII of the Civil Rights Act of 1964 prohibits an employer from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race...." 42 U.S.C. § 2000e-2(a)(1). Title VII forbids not only economic or tangible discrimination, such as discharge, demotion, or undesirable assignment, but it also prohibits conduct that creates hostile work environments. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 2283, 141 L.Ed.2d 662 (1998); *Burlington Indus. v. Ellerth*, 524 U.S. 742, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998); *Dey v. Colt Constr. and Dev. Co.*, 28 F.3d 1446, 1453 (7th Cir.1994). "When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993) (*quoting Meritor Sav. Bank v. Vinson*, 477 U.S. 57, 65, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)).

In order for a plaintiff to have an actionable hostile work environment claim under Title VII, a work environment must be both objectively and subjectively hostile. *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367. In other words, the environment must be one that a reasonable person in the plaintiff's position would find hostile or abusive, and one that the victim in fact did perceive to be so. *See Faragher*, 118 S.Ct. at 2283; *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998); *Dey*, 28 F.3d at 1454. This inquiry eliminates any requirement that a plaintiff demonstrate that the harassment concretely impaired his or her work performance or psychological well being, and focuses the inquiry on whether the harassment altered the terms and conditions of his or her employment. *Harris*, 510 U.S. at 21–22, 114 S.Ct. 367; *Dey*, 28 F.3d at 1454–55.

Relatively isolated instances of non-severe misconduct will not support a claim of hostile work environment, although a pervasive pattern of sexual jokes may incur Title VII liability. *See Dey*, 28 F.3d at 1456; *Rodgers v. Western–Southern Life Ins. Co.*, 12 F.3d 668, 674 (7th Cir.1993). The determination of a defendant's liability under Title VII " 'must be made on a case-by-case basis after considering the totality of the circumstances.' " *Rodgers*, 12 F.3d at 674 (*quoting Nazaire v. Trans World Airlines, Inc.*, 807 F.2d 1372, 1380–81 (7th Cir.1986)).

As a preliminary issue we consider whether the allegations involving Brown should be analyzed separately from those involving Ash–Simpson. Southern Bells says they should be considered separately; Gordon maintains otherwise. At least when examining the severity of the conduct, Plaintiff's assertion that we should consider the acts as a whole seems to be the more reasoned position. Whether the alleged conduct gives rise to liability must be determined based on the totality of the circumstances. *See Harris*, 510 U.S. at 22–23, 114 S.Ct. 367; *Rodgers*, 12 F.3d at 674. Gordon complains of harassing conduct by two individuals, Brown and Ash–Simpson. Therefore, we look at all of the alleged conduct, that occurring at the hands of Brown as well as of Ash–Simpson, in evaluating Gordon's claim.

### 1. Objective evaluation of the hostile environment claim.

An objectively hostile environment is one that a reasonable person would find hostile or abusive. *See Harris*, 510 U.S. at 21, 114 S.Ct. 367; *Adusumilli v. City of Chicago*, 164 F.3d 353, 361 (7th Cir.1998). Although there is no mathematically precise test to apply to the somewhat elusive question of whether an environment is objectively hostile or abusive, appropriate

factors that a court may consider include: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 22–23, 114 S.Ct. 367. Yet, "no single factor is required," and whether a work environment is " 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Id.* "It is not enough that a supervisor or coworker fails to treat a female employee with sensitivity, tact, and delicacy, uses course language, or is a boor. Such failures are too commonplace in today's America, regardless of the sex of the employee to be classified as discriminatory." *See Minor*, 174 F.3d at 858.

Given the fact-intensive nature of determining whether conduct is sufficiently severe or pervasive such that it becomes actionable under Title VII, we first address the contested testimony that forms a part of Gordon's allegations. First, Gordon alleges that she heard rumors that Brown had been involved in an extra-marital, inter-office affair. *See* Gordon Aff. ¶ 12. Southern Bells objects to this evidence because it is hearsay, irrelevant, and prejudicial. *See* Def. Reply. at 2. Second, Southern Bells wishes us to consider testimony by Fenneman that Brown, Sneed, and Beatty "specifically denied" that Brown engaged in any harassing conduct. *See* Defendant's Answer to Plaintiff's Interrogatory 8. It is clear that this testimony is hearsay if it is offered for the truth of the assertion, to wit, that the denials actually occurred. *See* FedR.Evid. 801(c).

■ Hearsay is unusable at summary judgment to the same extent it is inadmissible at trial. *See Minor*, 174 F.3d at 856; *Eisenstadt*, 113 F.3d at 742. In *Minor*,1 the Seventh Circuit considered the admissibility of testimony by the plaintiff of rumors that the harasser had previous sexual relationships with members of the university staff. *Id.* at 856. The court wasted no time in stating that these rumors were inadmissible hearsay. *See id.* The court further noted that we "must be particularly assiduous to enforce the hearsay rule in sexual harassment cases in order to protect the privacy both of alleged victims and alleged harassers against scurrilous rumors (designed to coerce either settlement or abandonment of the suit) regarding their sex lives." *Id.* We, of course, follow the Seventh Circuit's directive and hold that Gordon's testimony about rumors of Brown's inter-office affairs is inadmissible at the summary judgment stage. Likewise, Fenneman's testimony is also inadmissible hearsay. We note that the hearsay objections could have been overcome had either party actually deposed any witnesses and included their affidavits or deposition testimony as support for their briefs. Neither party did so, at least, not beyond the brief excerpts from Gordon's deposition and the affidavits of Gordon and Fenneman. Given the record before us, we hold that Fenneman's testimony concerning statements by Brown, Sneed, and Beatty to the effect that no improper conduct occurred is also inadmissible hearsay.

■ Moving to the uncontroverted evidence, over the course of Gordon's almost four-month tenure with Southern Bells, Gordon complains about two incidents involving Brown and a series of incidents involving Ash–Simpson.[9] Most of these

---

9. Gordon cites at least four discreet incidents where Ash–Simpson either asked her out, made inappropriate comments to her, or physically intimidated her. *See* Dep. at 218–221 (describing incident in car); *id.* at 220 (describing incident in storage closet); *id.* at 221 (describing incident where Ash–Simpson told her that she had a "nice ass"); *id.* at 223 (describing incident when he asked her out at a store location). In addition, she alleges that Ash–Simpson made inappropriate comments to her an indeterminate number of other times. *See id.* at 220 (stating that he would call "hey gorgeous" when he came into the office); *id.* at 223 (claiming that he repeatedly asked her out); *id.* at 224–25 (asserting that he told her she had "nice legs" eight or nine times over the course of her employment); Gordon Aff. ¶ 19 (stating that he made "repeated sexual advances" over several weeks).

incidents can properly be described as unwanted sexual advances or inappropriate sexual comments. *See* Dep. at 212–13, 218–21, 223, 224–25; Gordon Aff. ¶¶ 2, 3, 10, 19. Gordon also alleges at least one incident involving Ash–Simpson that must be described as physically intimidating, although no physical conduct actually occurred and the incident was quickly over. *See* Dep. at 223 (describing incident when Ash–Simpson, using his arms, physically blocked Gordon's exit from a storage room). One of the incidents with Brown involved demands by him that Gordon remove her bra, demands that included his swearing at her and insisting that she go to the restroom and not return until she had removed it. *See id.* at 202, 206, 208–09. On that occasion, a female co-worker present with Gordon in the restroom told Gordon that she should remove her bra or Brown would get mad. See *id.* at 208. Later that evening, during dinner, Brown allegedly pressured Gordon, Sneed, and Beatty to discuss their sexual fantasies and fetishes, *see id.* at 206–08, and he shared his as well. *See id.* Although Gordon resisted, she asserts that Brown "was very forceful," to a point where she finally thought of something to tell the group. *Id.* at 206–07.

Viewing the totality of the circumstances, we find that these incidents were sufficiently severe and pervasive that a reasonable person could find the environment hostile and abusive. It is true that relatively isolated instances of non-severe misconduct will not support a hostile environment claim. *See, e.g., Saxton v. American Tel. & Tel. Co.*, 10 F.3d 526, 533 (7th Cir.1993). Thus, if there are merely a few, non-severe instances of misconduct, courts generally do not find the conduct objectively actionable. *See id.* at 534 (finding two incidents over three weeks insufficient to meet objective prong); *White v. Dave & Buster's, Inc.*, No. 98–C–5685, 1999 WL 89572, at *2–*3 (N.D.Ill. Feb.12, 1999) (holding that three offensive touchings over six weeks failed to satisfy objective test). Similarly, a series of comments will not suffice if they are not sufficiently severe. *See Baskerville v. Culligan Int'l Co.*, 50 F.3d 428, 430–31 (7th Cir.1995) (finding that a series of comments spread over seven months was insufficient to establish liability in the absence of "physical contact ... uninvited sexual solicitations; [or] intimidating words"). However, if there is a series of such incidents or statements and they are sufficiently severe and pervasive, this could create an objectively hostile environment. *See Dey*, 28 F.3d at 1453.

In *Dey*, the plaintiff complained of five specific incidents involving the company's general counsel over two-and-a-half years. *Id.* at 1456. In addition, the plaintiff alleged that she had been subjected to almost daily comments, gestures and innuendo whenever he was around. *See id.* The court found these allegations sufficient to support a claim that a reasonable person would find the environment hostile and abusive. *See id.; see also Nelson v. Foster Wheeler Constructors, Inc.*, No. 97–C–4658, 1998 WL 792474, at *5 (N.D.Ill. Nov.9, 1998) (finding five incidents over eight months were sufficiently severe and pervasive); *Coleman v. PMC, Inc.*, No. 96–C–6248, 1998 WL 157071, at *6 (N.D.Ill. Mar.31, 1998) (holding that weekly racial slurs gave rise to hostile environment liability).

Unlike the plaintiffs in *Saxton* and *White*, Gordon was not subjected to relatively isolated incidents. Over the course of three and a half months, Gordon suffered at least two affronts from Brown and six from Ash–Simpson. Moreover, like the plaintiff in *Dey*, Gordon has alleged that Ash–Simpson made repeated comments to her about her body and physical appearance and repeatedly asked her out. And, like the plaintiffs in *Dey, Nelson,* and *Coleman,* the conduct that Gordon suffered was not merely a number of isolated incidents, but rather arguably a series of events that together created a hostile environment.

In addition, in contrast to the plaintiff in *Baskerville,* Gordon was subjected to in-

timidating actions, unwanted sexual solicitations or advances, and physical contact. While each of the events, looked at in isolation, may not have been severe, although we are inclined to view the first incident with Brown and the incident when Ash–Simpson cornered Gordon in the storage closet as severe, taking the entire circumstances into account, a reasonable person could conclude that the environment faced by Gordon was hostile or abusive. Accordingly, Gordon has raised a genuine issue of material fact as to whether her work conditions were objectively hostile or abusive.

### 2. Subjective evaluation of hostile environment claim.

The subjective inquiry need not detain us long in this case. Gordon describes her reactions to the incidents involving Brown as "uncomfortable," feeling "scared and intimidated" and "embarrassed and very nervous." Dep. at 208–09; Gordon Aff. ¶¶ 3, 6, 7. As for the incidents involving Ash–Simpson, she related having felt "scared" in the car, Dep. at 222, "cornered" in the storage closet, *id.* at 220, and uncomfortable when he made advances and comments to her. *See id.* at 224. Although Gordon never explicitly told Ash–Simpson "no" when he asked her out, *see id.,* or asked him to stop making the inappropriate comments to her, *see id.* at 225, these reactions by her are not necessary for Gordon to raise a genuine issue of material fact as to whether she subjectively perceived the work environment as hostile or abusive. She complained to Fenneman about the actions of both Brown and Ash–Simpson, *see id.* at 233, 237, and considering the events in their entirety, it is clear that Gordon has adduced evidence sufficient to satisfy her burden with respect to her subjective perceptions that her work conditions were hostile or abusive.

### 3. Southern Bells' liability for the hostile work environment.

Our examination into Gordon's putative hostile work environment claim is not complete until we assess Southern Bells' response, if any, to Gordon's alleged complaints regarding her work environment. Title VII protects employees from hostile workplace environments created by both supervisors and co-workers. *See Faragher,* 118 S.Ct. at 2284, 2289; *Ellerth,* 118 S.Ct. at 2267. In the absence of a tangible adverse employment action such as discharge, demotion or an undesirable assignment, an employer can be held vicariously liable for harassment at the hands of a supervisor with "immediate (or successively higher) authority over the employee." *Faragher,* 118 S.Ct. at 2292–93; *Ellerth,* 118 S.Ct. at 2270; *Adusumilli,* 164 F.3d at 358–59. In contrast, an employer is liable for co-worker sexual harassment only if the employee can establish that the employer knew or had reason to know about the harassment and failed to take appropriate remedial measures. *See Ellerth,* 118 S.Ct. at 2267; *Shepherd v. Slater Steels Corp.,* 168 F.3d 998, 1004 (7th Cir. 1999); *Adusumilli,* 164 F.3d at 358–59. Therefore, before evaluating Southern Bells' liability for the hostile work environment, we must determine whether Brown and Ash–Simpson's come under the supervisor liability standard or the co-worker liability standard.

The definition of supervisor is not specifically provided in Title VII, so our understanding of the term must emerge from the common law of agency and Title VII's purposes. *See Faragher,* 118 S.Ct. at 2285; *Meritor,* 477 U.S. at 72, 106 S.Ct. 2399; *Parkins v. Civil Constructors of Ill., Inc.,* 163 F.3d 1027, 1033 (7th Cir.1998). "[T]he touchstone for determining supervisory status is the extent of authority possessed by the purported supervisor." *Parkins,* 163 F.3d at 1033. The essence of this examination is to determine the authority to affect the terms and conditions of the victim's employment, primarily "the power to hire, fire, demote, promote, transfer, or discipline the employee." *Id.* at 1034. Absent the entrustment of at least some of this authority, an employee

is not a "supervisor" for the purpose of imputing Title VII liability. *See id.*

 Although neither party explicitly lays out Gordon's relationship to Brown, at this stage in the proceedings it is reasonable to infer that Brown was Gordon's "supervisor" for the purposes of Title VII. Brown was co-owner and vice-president of Southern Bells. *See* Joint Statement ¶ 20. As such, we infer that Brown possessed the ability to affect all of the terms and conditions of Gordon's employment laid out in *Parkins.* He either was Gordon's direct supervisor or exercised "successively higher authority" over Gordon, as enunciated by the Court. *See Faragher,* 118 S.Ct. at 2292–93; *Ellerth,* 118 S.Ct. at 2270. Thus, Southern Bells' liability for Brown's acts clearly fits under the supervisor liability standard.

In contrast, we infer for purposes of Title VII that Ash–Simpson was Gordon's co-worker rather than her supervisor. Ash–Simpson was a district manager with Southern Bells, and arguably senior to Gordon. *See* Dep. at 217–31; Gordon Aff. ¶ 19. However, Ash–Simpson was responsible for supervising the Restaurant General Managers of the restaurants in his district, *see* Joint Statement ¶ 18, and thus had "no supervisory authority over Gordon" and "no authority to unilaterally take any personnel action with respect to Gordon including but not limited to hire, discharge, promotion, demotion, transfer, wage increase or reduction, or disciplinary action, and did not participate in any evaluation or review of Gordon's job performance." *Id.* ¶ 19 (punctuation added). In short, he was not entrusted with any of the necessary powers to qualify as a "supervisor" under Title VII. *See Parkins,* 163 F.3d at 1034. Therefore, Southern Bells' liability for Ash–Simpson's acts fits under the co-worker liability's standard. Unlike our examination of the overall severity or pervasiveness of the harassment, where we considered all of the behavior together, here, our analysis must separate out Southern Bells' potential liability for Brown's alleged harassment from its po-

tential liability for Ash–Simpson's alleged harassment.

### a. Southern Bells' liability for Brown's conduct.

 As the Court noted in *Ellerth,* employers are strictly liable for supervisor harassment that does not lead to a tangible employment action. *Id.* at 2270. However, this liability is limited by a defense comprised of two necessary elements: "(a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher,* 118 S.Ct. at 2293; *Shaw v. AutoZone, Inc.,* 180 F.3d 806, 810 (7th Cir.1999).

> While proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense. And while proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense.

*Faragher,* 118 S.Ct. at 2293

The Seventh Circuit recently explained how this affirmative defense works, in *Shaw.* First, the employer bears the burden of proving the affirmative defense by a preponderance of the evidence. *See id.* at 810 (citing *Ellerth,* 118 S.Ct. at 2270). The first element actually requires the court to look separately at the employer's preventative mechanisms and whatever corrective measures were taken in the instant case. *See Shaw,* 180 F.3d at 811, 812–13. Thus,

it is when looking at the employer's reasonable preventative measures that the existence of an anti-harassment policy has an impact, *see id.* at 811, because an appropriate policy is one way for the employer to show that it had reasonable preventative measures in place. *See Ellerth,* 118 S.Ct. at 2270; *Shaw,* 180 F.3d at 811; *Parkins,* 163 F.3d at 1037. However, such a policy will not satisfy this affirmative defense if it has not been disseminated to the employees. *See Faragher,* 118 S.Ct. at 2293; *Shaw,* 180 F.3d at 811. The first element of the defense also requires the employer to prove that it "exercised reasonable care to respond to the sexual harassment." *Shaw,* 180 F.3d at 812. Even if the employer succeeds in proving it took reasonable steps to prevent and correct promptly any sexual harassment, it must also establish that the employee " 'unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer or to avoid harm otherwise.' " *Id.* at 813 (quoting *Ellerth,* 118 S.Ct. at 2270).

In *Shaw,* the uncontroverted evidence established that the employer had an anti-harassment policy in place that was distributed to each employee. *Id.* at 811. It was also undisputed that the plaintiff received a copy of the policy with her employee handbook and that she signed an acknowledgment form stating that she knew it was her responsibility to read and learn the policies contained in the handbook. *See id.* This was enough for the court to determine that even if the plaintiff had no actual knowledge of the policy, she had "constructive knowledge" of the policy. *Id.* In addition to the policy, the defendant regularly conducted training sessions on sexual harassment. *See id.* at 812. The court also noted that without any notice of the harassment, as developed more fully below, there was nothing for the employer to respond to. *See id.* The court held

that, as a matter of law, in the face of no notice and an established anti-harassment policy of which the plaintiff was aware, the defendant "exercised reasonable care to prevent sexual harassment." *Id.*

Moreover, the court stated in *Shaw* that the facts showed the plaintiff failed to take advantage of any of the mechanisms provided to complain about sexual harassment. *See id.* at 813. She never reported the harassment to anyone, she did not tell the harasser to stop making the inappropriate comments, and she ignored any attempts by her employer to find out why she was quitting. *See id.* Pointing to these actions, the court concluded that the plaintiff "acted ·in precisely the manner that a victim of sexual harassment should not act in order to win recovery under the new law." *Id.* These facts led the court to hold that the employer had satisfied its burden under the second prong of the *Ellerth* affirmative defense. *See Shaw,* 180 F.3d at 813.

 In contrast to the employer in *Shaw,* we cannot conclude that Southern Bells has satisfied its burden under the *Ellerth* affirmative defense with respect to Brown's harassing actions.[10] The employer in *Shaw* indisputably had an anti-harassment policy in place and the employee had knowledge of it, as evidenced by a signed acknowledgment form reflecting receipt of the employee handbook. In the case at bar, Gordon does not dispute that an employee's handbook and memorandum existed, *see* Fenneman Aff.Ex. A, at 17; Ex. C, allowing us to conclude that Southern Bells had an anti-harassment policy in place. However, the evidence does not establish that Southern Bells had ever disseminated it. Gordon maintains she was never provided either the handbook or the memorandum and was unaware of the policy's existence. *See* Gordon Aff. ¶ 7. She

10. Gordon may argue that this affirmative defense is unavailable because she did in fact suffer a tangible employment action. However, as we discuss with respect to Gordon's retaliation claim, *infra,* Gordon has not satis-

fied her burden of showing that any tangible employment action suffered by her can be tied in any way to the harassment or Gordon's complaints thereof.

also claims that no anti-harassment forms were available anywhere in the office. *See id.* Southern Bells has not provided us with any signed form indicating that Gordon knew of its policy. In addition, Southern Bells has not shown that it had any anti-harassment training in place, as was the case in *Shaw.* These deficiencies require us to conclude that Southern Bells has not satisfied its burden of establishing that it took reasonable steps to prevent sexual harassment. *Cf. Equal Employment Opportunity Commission v. Wal-Mart Stores, Inc.,* 187 F.3d 1241, 1249 (10th Cir.1999) (holding that an employer's written anti-discrimination policy, standing alone, "does not demonstrate an implemented good faith policy of educating employees on the [ADA]'s accommodation and nondiscrimination requirements ... [and] demonstrates a broad failure on the part of Wal–Mart ... to prevent discrimination in the workplace."). The first prong of· the *Ellerth* affirmative defense goes unmet.

Even if we were to find that Southern Bells satisfied its burden with respect to the first prong of the defense, we must conclude that it also failed to satisfy its burden with respect to the second prong. Since proof of *both* prongs is necessary to establish the affirmative defense, failure to establish either prong alone would prevent Southern Bells from prevailing on this defense. *See Shaw,* 180 F.3d at 813. Unlike the plaintiff in *Shaw* who remained silent about the harassment, Gordon complained directly to Fenneman about Brown's harassment, *see* Joint Statement ¶ 20, and in that sense Gordon did not act "precisely [in] the manner that a victim of sexual harassment should not act." *Shaw,* 180 F.3d at 813. Putting aside the anti-harassment policy for the moment, Gordon's complaint to Fenneman about Brown's conduct seems eminently reasonable under the circumstances. Fenneman and Brown were co-owners of Southern Bells. *See* Joint Statement ¶ 3. Gordon believed that complaints about one co-owner should be made to the other co-owner. *See* Gordon Aff. ¶ 14. We are not pre-pared to say that this complaint procedure, as a matter of law, shows that Gordon unreasonably failed to take advantage of Southern Bells' preventative or corrective opportunities.

Even if we look only to the anti-harassment policy in place, it appears that Gordon complied with its requirements. The policy stated in Southern Bells' handbook requires employees to "report the situation immediately to a manager, fill in the form provided to you in the break area of your restaurant, or call the Human Resource Department at the main office." Fenneman Aff.Ex. A, at 17. The employee memorandum directs only that employees report sexual harassment "to the office." Fenneman Aff.Ex. C. Thus, a report by Gordon either to her manager or to "the office" should suffice. While it is not clear who Gordon's manager technically was, Fenneman himself stated that she reported directly to him. Fenneman Aff. ¶ 8. We conclude from this that Fenneman did in fact act as her manager and that Gordon's report to Fenneman satisfied the Handbook's description of her duties under the policy. There is also nothing on the face of the employee memorandum, or in any evidence that Southern Bells has produced, that indicates "to the office" means only to human resources or some other specified channel. Thus, when Gordon reported the harassment to Fenneman himself, she did report the harassment to "the office." Gordon's actions foreclose Southern Bells' ability to satisfy the second prong of the *Ellerth* affirmative defense. For these reasons, Southern Bells' motion for summary judgment must be *denied* with respect to the sexual harassment suffered at the hands of Brown.

### b. *Southern Bells' liability for Ash–Simpson's conduct.*

 In cases of co-worker sexual harassment, "an employer's legal duty ... will be discharged if it takes reasonable steps to discover and rectify acts of sexual harassment by its employees." *Parkins,* 163 F.3d at 1035 (citing *Baskerville,* 50

F.3d at 432). This liability is triggered only where the employer has notice or knowledge that the harassment has occurred. *Parkins*, 163 F.3d at 1035 (citing *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1014 (7th Cir.1997)). The first step is to determine whether the employer has designated a channel for complaints of harassment. *Parkins*, 163 F.3d at 1035. Where such a person is not identified or easily accessible, "an employer can receive notice of harassment from a 'department head' or someone that 'the complainant reasonably believed was authorized to receive and forward (or respond to) a complaint of harassment.'" *Id.* (quoting *Young v. Bayer Corp.*, 123 F.3d 672, 674 (7th Cir.1997)). Ultimately, the employee must present enough evidence that she "'gave the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed.'" *Parkins*, 163 F.3d at 1035 (quoting *Zimmerman v. Cook County Sheriff's Dep't*, 96 F.3d 1017, 1019 (7th Cir.1996)). Once the employer has such notice that harassment has occurred, the law requires that it respond in a manner that is reasonably likely to prevent future harassment. *See Parkins*, 163 F.3d at 1036; *Saxton*, 10 F.3d at 536. Whether the employer's response is reasonable depends upon "the gravity of the harassment." *Baskerville*, 50 F.3d at 432.

■ Here, we believe that Gordon has satisfied her burden of establishing that Southern Bells had notice of Ash–Simpson's harassment. As was true with respect to its liability for Brown's harassment, the parties dispute whether Southern Bells effectively designated a channel for complaints of harassment. However, Gordon's complaint to Fenneman about Ash–Simpson's conduct, *see* Dep. at 237–38; Gordon Aff. ¶¶ 19–23, is sufficient for the same reasons we have cited above. Not only could Gordon reasonably believe that Fenneman was authorized to receive complaints and respond to them, but as we have previously noted complaining to Fenneman appears to comply with the express requirements of Southern · Bells' anti-harassment policy.

Gordon has satisfied her burden to show that her complaint to Fenneman that "someone else here is bothering me," *see* Dep. at 237, was sufficient to put a reasonable employer on notice that she was being harassed. Gordon's complaint came on the heels of her complaints about Brown's conduct, complaining about Brown's harassment *also to Fenneman*, in late July. *See* Joint Statement ¶ 20. Although a dispute exists over whether Gordon's complaint about Ash–Simpson occurred before or after Fenneman received the letter of representation from Gordon's attorney, the timing of her complaint about Brown, her complaint about Ash–Simpson, and Fenneman's receipt of the letter all indicate that Fenneman was reasonably on notice that harassment had occurred.

Fenneman's own words support the conclusion that he did, in fact, believe that Gordon's complaint was about sexual harassment from somebody other than Brown. Fenneman responded by telling Gordon that Southern Bells has "forms for that that you fill out." Dep. at 237. Southern Bells also states that "he would defer responsibility for someone other than the vice-president to the sexual harassment procedure." Def. Reply at 5. From this, it is obvious that Fenneman understood that Gordon was complaining about sexual harassment.

Despite Southern Bells' notice of Ash–Simpson's conduct, it apparently took no steps to determine who was harassing Gordon or to prevent its future occurrence. Fenneman's only response was to dismiss Gordon from his office and tell her that there were forms for her to use to file a complaint. *See* Dep. at 237–38. Although Gordon claims she asked Fenneman for such a form, the evidence suggests that he never provided her with one. *See id.* In fact, there is a total lack of any evidence that Southern Bells took any action at all. Gordon has thus satisfied her burden of showing that Southern Bells did not rea-

sonably respond in a manner likely to prevent future harassment from occurring. For these reasons, Southern Bells' motion for summary judgment must be *denied* with respect to the sexual harassment suffered at the hands of Ash–Simpson.

### C. Retaliation Claim

 Title VII makes it unlawful for an employer to discriminate or retaliate against any of its employees for opposing an unlawful, discriminatory employment practice. *See* 42 U.S.C. § 2000e–3(a). A plaintiff in a Title VII case may offer either direct proof of sex-based discrimination or retaliation or may use the burden shifting approach established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Johnson v. University of Wisconsin–Eau Claire,* 70 F.3d 469, 477 (7th Cir.1995).

 Although Gordon fails to acknowledge any proof paradigm in her opposition to summary judgment, she has not alleged that she has direct proof of retaliation. Instead, she relies on her efforts to create an inference of retaliation via indirect evidence, putting us squarely within the *McDonnell Douglas* paradigm. To prove a prima facie case of retaliation under Title VII, Gordon must show that (1) she engaged in statutorily protected expression, (2) she suffered an adverse action by her employer, and (3) a causal link connects the adverse action and the protected expression. *See Sweeney v. West,* 149 F.3d 550, 555 (7th Cir.1998). Gordon must prove the causal link by showing that Southern Bells would not have taken the adverse action "but for" the protected expression. *Prentice v. Information Resources, Inc.,* No. 97–2405, 1998 WL 67702, at *2 (7th Cir. Feb.10, 1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 86, 142 L.Ed.2d 68 (1998) (*citing McKenzie v. Illinois Dep't of Transp.,* 92 F.3d 473, 483 (7th Cir.1996)).

If Gordon establishes her prima facie cases, inferences of impermissible discrimination and retaliation arise, and the burden of production shifts to Southern Bells to articulate a legitimate, non-discriminatory reason for taking the adverse employment actions. *See Brill v. Lante Corp.,* 119 F.3d 1266, 1270 (7th Cir.1997). If Southern Bells succeeds in doing so, the inferences of discrimination and retaliation dissolve, and Gordon must prove that Southern Bell's proffered reasons are false and merely a pretext for discrimination and retaliation. *See Crim v. Board of Educ. of Cairo Sch. Dist.,* 147 F.3d 535, 540 (7th Cir.1998). Pretext is much more than a mistake, however; it is "a lie, specifically a phony reason for some action." *Russell,* 51 F.3d at 68. "Because a Title VII claim requires intentional discrimination, the pretext inquiry focuses on whether the employer's stated reason was honest, not whether it was accurate." *Helland v. South Bend Community Sch. Corp.,* 93 F.3d 327, 330 (7th Cir.1996). The ultimate burden of proving intentional discrimination " 'remains at all times' " with Gordon. *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) (*quoting Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Applying these principles, we find that Gordon has failed to meet her burden with regard to the retaliation claim because she has failed to rebut Southern Bells' proffered legitimate justifications for its actions.

#### 1. Prima facie case of retaliation

##### a. Protected activity

The first step in establishing a prima facie case is for plaintiff to show that she engaged in protected activity. *See Sweeney,* 149 F.3d at 555; *Hunt–Golliday v. Metropolitan Water Reclamation Dist. of Greater Chicago,* 104 F.3d 1004, 1013 (7th Cir.1997). Title VII clearly protects employees from hostile work environments. *See Faragher,* 118 S.Ct. at 2283; *Ellerth,* 118 S.Ct. at 2270; *Dey,* 28 F.3d at 1453. This purpose would be severely limited if § 2000e–3 did not protect employees from retaliation for complaining about such hostile environments. *See, e.g., Hunt–Golliday,* 104 F.3d at 1013; *see also Adusumil-*

*li,* 164 F.3d at 362 (treating complaint of sexual harassment to management as protected activity but finding discharge not causally related to the complaints). The parties here agree that Gordon complained to Fenneman about Brown's harassment in late July 1998. *See* Joint Statement ¶ 20. Gordon also alleges that, in mid-August 1998, Fenneman received a letter of representation from her attorney regarding the harassment and that she complained to Fenneman about Ash–Simpson. *See* Gordon Aff. ¶¶ 16, 19. Thus, Gordon has established that she engaged in protected activity and accordingly has met the first prong of the prima facie test.

### b. *Adverse employment action*

■ The second step Gordon must establish is that she suffered an adverse employment action. "Adverse employment action has been defined quite broadly in [the Seventh Circuit]." *McDonnell v. Cisneros,* 84 F.3d 256, 258–59 (7th Cir. 1996). An adverse employment action is "not limited solely to loss or reduction of pay or monetary benefits. It can encompass other forms of adversity as well." *Collins v. Illinois,* 830 F.2d 692, 703 (7th Cir.1987). Yet, not all actions that make employees unhappy constitute actionable adverse employment actions. *See, e.g., Smart v. Ball State Univ.,* 89 F.3d 437, 441 (7th Cir.1996). "[W]hether an employee has suffered a materially adverse employment action will normally depend on the facts of each situation." *Bryson v. Chicago St. Univ.,* 96 F.3d 912, 916 (7th Cir. 1996). However, to constitute an adverse employment action under Title VII, the employment action must affect the "terms or conditions of [the plaintiff's] employment." *King v. Board of Regents of Univ. of Wis. Sys.,* 898 F.2d 533, 537 (7th Cir. 1990).

■ Based on the record before us, we cannot conclude that Gordon has succeeded in establishing that she suffered an adverse employment action. The heart of her claims includes that she was excluded from managers' meetings, that the promotions tracking responsibilities were re-moved from her, that she was denied new promotional opportunities to develop, that she was ostracized, that she was harassed by Fenneman with phone calls, and that she was subjected to more onerous reporting requirements. *See* Dep. at 173–76, 181, 188; Gordon Aff. ¶¶ 15, 21, 24, 25, 27. Analyzing these events, we are left with some skepticism over whether they meet the definition of an adverse action.

Gordon's claims that she was excluded from the monthly managers' meetings and required to submit daily action reports are probably the most promising for plaintiff in her effort to characterize them as actionable adverse employment actions. "A materially adverse change might be indicated by ... significantly diminished material responsibilities, or other indices that might be unique." *Rabinovitz v. Pena,* 89 F.3d 482, 489 (7th Cir.1996) (citing *Crady v. Liberty Nat'l Bank & Trust Co. of Ind.,* 993 F.2d 132, 136 (7th Cir.1993)). Exclusion from a policy making role is one such diminution of responsibility that can support a charge of discrimination. *See Johnson v. City of Fort Wayne,* 91 F.3d 922, 932–33 (7th Cir.1996). Likewise, actions that damage the plaintiff's professional credibility can constitute an adverse employment action. *See Hetreed v. Allstate Ins. Co.,* No. 96–C–2021, 1999 WL 311728, at *7 (N.D.Ill. May 12, 1999).

In *Johnson,* the plaintiff was an assistant fire chief. *Id.* at 929. The plaintiff alleged that he had been discriminated against by being excluded from participating in meetings between the fire chief and the assistant chiefs. *See id.* at 932. The court held that such action deprived the plaintiff of the ability to perform essential functions and thus was an actionable adverse employment action. *See id.* at 932–33. In *Hetreed,* the plaintiff was placed in on an internal audit committee by the employer and then stripped of the appointment after she made routine inquiries. *Id.,* 1999 WL 311728, at *7. The court found that this reduction in duties could be actionable because it damaged her professional credibility. *See id.*

Accepting Gordon's allegations as true, as we are required to do at this juncture, Southern Bells excluded her from managers' meetings which she was entitled to attend. *See* Gordon Aff. ¶ 21. This exclusion is analogous to the exclusion in *Johnson.* Both the *Johnson* plaintiff and Gordon allege that, as a result of their employers' discrimination, they were excluded from policy-making meetings. Southern Bells also required Gordon to provide information about her whereabouts, information that was not previously required, and in a manner that made her feel humiliated. *See* Gordon Aff. ¶ 26, 27, 28. This humiliation is similar to the allegations in *Hetreed.* We note that while we are not totally convinced that these actions actually rise to the level of actionable adverse employment actions, given the Seventh Circuit's broad definition of adverse employment actions, we will assume that on this element Gordon has met her burden that she experienced an adverse employment action.

Gordon's other claims have less merit as adverse employment actions. Gordon herself has admitted that she did not feel that removing the promotions tracking requirements was a demotion. *See* Dep. at 190. At best this was equivalent to a transfer without a demotion, a circumstance that the Seventh Circuit has repeatedly held not to be an adverse employment action. *See Rabinovitz,* 89 F.3d at 489 (retaliation in context of Title VII); *Crady,* 993 F.2d at 136 (retaliation in context of ADEA); *Spring v. Sheboygan Area Sch. Dist.,* 865 F.2d 883, 886 (7th Cir.1989) (retaliation in context of ADEA). As for Gordon's claim that she was given no new promotions to develop, we note that this allegation is singularly unsupported by any evidence. In fact, the only time that it is mentioned by Gordon is in her affidavit when she discusses the promotion tracking system. *See* Gordon Aff. ¶ 25. She provides no evidence that she developed promotions prior to her protected activity, nor how that changed after her complaints had been lodged. Thus, we will not consider these allegations in evaluating Gordon's claims.

As for the phone calls and "harassment" by Fenneman, these appear to be claims of retaliatory reprimands or negative evaluations. Absent a tangible job consequence, retaliatory reprimands or negative evaluations as such are not within the purview of Title VII. *See Sweeney,* 149 F.3d at 556; *Smart,* 89 F.3d at 442. "If we interpreted these simple personnel actions as materially adverse, we would be sending a message to employers that even the slightest nudge or admonition (however well-intentioned) given to an employee can be the subject of a federal lawsuit." *Sweeney,* 149 F.3d at 556. Thus, in *Sweeney,* where the plaintiff had received two counseling statements, but no disciplinary action beyond admonishing her to improve, the court expressed doubt as to whether these were "adverse employment actions." *Id.* Likewise, in *Smart,* the plaintiff received allegedly undeserved negative performance ratings, *id.* at 442, prompting the court to conclude that the evaluations alone did not constitute an actionable adverse employment action. *See id.*

We construe Fenneman's phone calls to Gordon and other monitoring activities as admonishments to improve and negative evaluations á la *Sweeney* and *Smart.* As was true in those situations, Gordon did not suffer any tangible detriment from these actions. At most, they made her feel targeted and uncomfortable. Without tangible effects, these activities do not fall within Title VII's ambit. *See Sweeney,* 149 F.3d at 556; *Smart,* 89 F.3d at 442.[11]

---

11. It is possible that a series of employment actions that in isolation do not seem to be retaliatory may indicate retaliation when considered together. *See McKenzie,* 92 F.3d at 483 n. 7. While we have found that only one or two of Gordon's allegations rise to the level of an adverse employment action, *see supra,* it is possible that the combination of these actions supports a charge of retaliation. In an effort to give Gordon's allegations the benefit of all reasonable inferences, we will assume that all of the actions taken by Southern Bells,

#### c. Causal link between protected activity and adverse action.

Gordon's final obligation is to establish a causal link exists between her protected activity and the adverse employment actions taken. A short time span between protected activity and an adverse employment action may be sufficient to prove a causal connection between the two events. *See McClendon v. Indiana Sugars, Inc.,* 108 F.3d 789, 797 (7th Cir.1997) (citations omitted); *Hunt–Golliday,* 104 F.3d at 1014 (noting that "suspicious timing does constitute circumstantial ... evidence to support a claim of discrimination").

A close temporal connection between the two events is generally enough to satisfy the third element of the *prima facie* case. However, as the temporal distance between the claimant's protected expression and the adverse action increases, it is less likely that there is a causal link between the two events.

*McClendon,* 108 F.3d at 797. In *McClendon,* the Seventh Circuit found that a two-to-three day progression of events was sufficiently close to establish a causal nexus, citing cases finding one day or one week sufficient. *See McClendon,* 108 F.3d at 797. In *Hunt–Golliday,* the plaintiff complained to management about discrimination and a week later she was reported to her supervisors for an alleged infraction. *Id.* at 1015. The court found that the timing yielded an inference of a causal link between the events. *See id.*

Gordon alleges that the various adverse employment actions she experienced commenced within weeks of her initial complaints about Brown and on the day she complained about Ash–Simpson's behavior and Fenneman received her attorney's letter. *See* Dep. at 173, 181–83, 188; Gordon Aff. ¶¶ 15, 21, 25. Thus, as in *McClendon* and *Hunt–Golliday,* the adverse actions occurred in close sequence to the protected activities. Clearly, the actions taken by Southern Bells that constituted "adverse actions," occurring in the in toto, satisfy the second element of Gordon's

close temporal relationship to Gordon's complaints are sufficient to establish a causal nexus and suffice to allow Gordon to meet the burden of the third prong of her prima facie case.

#### 2. Legitimate business justifications and pretext.

Having determined that Gordon has established her prima facie case, the burden shifts to Southern Bells to articulate a legitimate, non-retaliatory business justification for the adverse actions taken. *See Brill,* 119 F.3d at 1270. Although the burden of production shifts to Southern Bells, Gordon retains the burden of persuasion at all times. *See Hicks,* 509 U.S. at 507, 113 S.Ct. 2742; *Adusumilli,* 164 F.3d at 362. However, this burden on Southern Bells is not onerous.

Southern Bells has articulated legitimate business reasons for each of the actions alleged by Gordon. With respect to Gordon's allegation that she was improperly excluded from managers' meetings, Southern Bells responds that Gordon was never senior staff and was only at the meetings as she needed to make a presentation. *See* Fenneman Aff. ¶ 6. Since there was no presentation by her needed in August and September, Gordon was not included at those meetings. *See id.* With respect to the daily activity reports, Fenneman has testified that they were needed as Gordon's responsibilities outside of the office grew. *See id.* ¶ 8. Although initially they required only oral reports from Gordon, Southern Bells asserts that, as her responsibilities grew, these reports became less satisfactory. *See id.* Thus, Fenneman required Gordon to submit the same written action reports that he usually required from senior staff. *See id.* The parties also agree that the promotions tracking duties were removed from Gordon at the same time Fenneman told her he wanted her to spend less time in the office and more time in the field. *See* Dep. at 192. Southern Bells corroborates this by its prima facie case.

assertion that Gordon was hired to fill a position that was meant to require her to spend increasing amounts of time outside the office coordinating activities with store managers and district managers. *See* Fenneman Aff. ¶ 7.

Finally, with respect to Fenneman's phone calls to Gordon, Southern Bells rejoins that these calls were made in response to complaints by store managers that Gordon had not returned their phone calls and that Gordon had failed to keep Fenneman informed of her whereabouts. *See* Dep. at 176, 179. Southern Bells explains that all corporate staff are required to keep their supervisors informed of their whereabouts during normal business hours, normally by keeping the receptionist informed. *See* Fenneman Aff. ¶ 9. Gordon admits that Fenneman would call the receptionist on a regular basis and that at least one of the phone calls to her was prompted when the receptionist did not know where Gordon was. *See* Dep. at 176. Fenneman states that he views it as unacceptable for the salaried staff to be unaccounted for during normal hours and that he became frustrated by Gordon's lack of accountability and resistance to keeping him informed of her activities. *See id.*

Since Southern Bells has met its burden of production with respect to legitimate business justifications, Gordon must come forth with additional evidence to support her burden of persuasion that Southern Bells impermissibly retaliated against her. *See Hicks,* 509 U.S. at 507, 113 S.Ct. 2742 (*quoting Burdine,* 450 U.S. at 253, 101 S.Ct. 1089). Given Southern Bells' justifications, the inferences of discrimination and retaliation dissolve, and Gordon must respond with sufficient evidence to prove that Southern Bell's proffered reasons are false and only a pretext for discrimination and retaliation. *See Crim,* 147 F.3d at 540.

Gordon's only response to Southern Bells' proffered reasons is "that is an argument to be made to the jury at a later date." Pl. Answer Brief at 11. No attempt has been made to refute Southern

Bells' justifications or to show they are "a lie, specifically a phony reason for some action." *Russell,* 51 F.3d at 68. Nor does Gordon dispute "whether the employer's stated reason was honest." *Helland,* 93 F.3d at 330. In making this contention, Gordon's attorney severely misunderstands our role at summary judgment.

To survive a motion for summary judgment, Gordon must counter Southern Bells' evidence "with materials of evidentiary quality ... that created an issue of fact as to whether the reasons offered by the company were sincere ... not 'pretextual'—or other discriminatory reasons had played a role in motivating the actions." *Russell,* 51 F.3d at 67 (citing *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089) (internal citation omitted). In the face of Southern Bells' uncontested grounds for taking the alleged adverse employment actions, "no reasonable jury could infer" that the justifications were pretextual. *See id.* at 70; *see also Sweeney,* 149 F.3d at 556–57 (noting that plaintiff "made almost no effort ... to call ... [the defendant's] reasons into question" and that this was insufficient to meet her burden at the pretext stage); *Johnson,* 70 F.3d at 480, 481 (affirming summary judgment for defendant where plaintiff has provided no evidence of pretext in the face of legitimate business justifications); *Gilinsky v. Columbia Univ.,* 488 F.Supp. 1309, 1316 (S.D.N.Y. 1980) (noting that even if plaintiff proved her prima facie case, she still lost at summary judgment because she offered no evidence of pretext in the face of legitimate business justification); *cf. Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 ("The nonmoving party, however, may not rest upon mere denials or allegations in the pleadings, but must set forth specific facts sufficient to raise a genuine issue for trial."). Therefore, even if we assume that Gordon has successfully established a prima facie case of retaliation, her claim fails due to her inability to provide any evidence that Southern Bells' asserted justifications were pretextual. For that reason, South-

ern Bells' motion for summary judgment as to Count II is *Granted.*[12]

### Conclusion

For the reasons discussed, we *DENY* Southern Bells' motion for summary judgment as to Gordon's hostile work environment claim, but we *GRANT* its motion as to Gordon's retaliation/constructive discharge claim.

---

**12.** We note that although Gordon's Complaint lists retaliation as her claim in both Count II and in her EEOC charge, *see* Compl. ¶¶ 18–20; Compl.Ex. A, both parties discuss Count II in the context of whether Southern Bells constructively discharged Gordon. *See* Def. Brief in Supp. at 28 ("PLAINTIFF'S CLAIM OF CONSTRUCTIVE DISCHARGE"); Pl. Answer Brief at 10 ("The facts, as Set Forth by Plaintiff, Created a Constructive Discharge"). To state a claim for constructive discharge, Gordon must show that "an employee's discriminatory working conditions were so intolerable that a reasonable person would have been compelled to resign." *Perry*, 126 F.3d at 1015 (citing *Rabinovitz*, 89 F.3d at 489). However, the underlying conditions leading up to the resignation must themselves have been the result of unlawful discrimination. *See Rabinovitz*, 89 F.3d at 489. Thus, in order for Gordon to survive summary motion on Count II under a constructive discharge theory, she must prove that the same allegations put forth in our discussion of retaliation were both discriminatory and would have compelled a reasonable person to resign. Since we have found that Gordon has failed to establish that any of the allegations in Count II were based upon discriminatory motives, she is stopped at the first hurdle of a constructive discharge claim.